# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-1775
_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the District |
| | * | of Nebraska. |
| Kerry L. Baker, | * | |
| | * | |
| Defendant - Appellee. | * | |

_____

Submitted: October 21, 2003
Filed: May 11, 2004

_____

Before BYE, JOHN R. GIBSON, and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

The United States appeals from the district court's post-verdict grant of Kerry L. Baker's motion for acquittal on a crack cocaine conspiracy charge. Because the district court's ruling involved credibility determinations, and because substantial evidence supported the jury's verdict, we reverse.

The government charged Baker under a three count, superceding indictment. Count I alleged conspiracy to distribute and possess with intent to distribute more than fifty grams of cocaine base (crack cocaine). Count II alleged possession of a firearm in furtherance of the cocaine conspiracy. Count III alleged possession of a firearm by a felon.

The original indictment did not contain Count III. Count I of the original indictment specifically alleged a drug conspiracy that involved Baker and a suspected Omaha-area drug dealer named Gary Johnson. The original indictment listed Johnson as a co-defendant with Baker. In the superceding indictment, the government dropped Johnson as a defendant and removed reference to Johnson, charging instead that Baker was involved in a conspiracy to distribute crack cocaine from February 1, 2000, through June 30, 2001, with "other persons, both known and unknown."

Notwithstanding the fact that Count I of the superceding indictment contained no reference to Johnson, the government presented a case against Baker that involved extensive physical evidence and testimony regarding Johnson's activities as the local leader of a crack cocaine conspiracy. The government presented evidence to show that Johnson brought in powdered cocaine from outside the Omaha area, primarily from a source in Phoenix, Arizona. The government also presented evidence to demonstrate that Johnson distributed this cocaine, in both powdered and crack form, through various dealers below him in the Omaha distribution chain. Based on the evidence presented, it is fair to characterize the government's theory of the case as a large conspiracy–the Johnson conspiracy–with Baker as conspirator who received powdered and crack cocaine from Johnson for resale in Omaha.

The evidence against Baker showed the following. Omaha police and an FBI agent (collectively the "Officers") conducted a trash pull at Baker's residence. In his

trash, they found marijuana seeds, clear plastic bags, and materials that identified the garbage as Baker's. The clear plastic bags were torn and their tops were tied off. Officers testified that small quantities of drugs are often sold in bags that are ripped and tied-off. The clear plastic bags found in Baker's trash tested positive for cocaine residue. One of the Officers testified that, in his experience, it was common for drug dealers to deal in more than one type of drug.

Officers obtained a search warrant for Baker's home. There they found an unlocked safe under a bathroom vanity off the master bedroom. The safe contained four hundred thirty-six dollars, mostly in one-dollar bills. The safe also contained eleven gold-colored coins. Behind the safe, Officers found a brown paper bag that contained twenty-two individually wrapped bags of marijuana. In the adjacent bedroom, Officers found a small bag of marijuana in the pocket of a pair of men's jeans. On a shelf in the bathroom, Officers found an unregistered .380 automatic pistol that was loaded with a magazine that contained six rounds. In Baker's garage, Officers found several plastic grocery bags that contained cellophane wrap strapped with duct tape. Officers testified that this material was typical wrapping for kilogram-sized bricks of powdered cocaine. This material later tested positive for cocaine residue. Still in the garage, Officers found a marijuana cigarette and a gallon-size zip-lock bag with marijuana residue. Finally, Officers noted that there was a large, older, white, American convertible in the garage.

Officers attempted a controlled buy from Baker using a confidential informant, but Baker did not sell any drugs to the confidential informant.

Cooperating witness Cherie Carter testified that on two occasions she went with Johnson to the barber shop where Baker worked so that Johnson could deliver cocaine to Baker. She stated that on one of these occasions, she handed Johnson two ounces of crack cocaine and watched and waited as Johnson went inside to drop it off. Carter reported that Johnson also identified Baker and Roscoe Wallace as people who

dealt cocaine with Johnson. She specifically stated that Johnson said it was safe to deal with Baker.

Baker objected to the admission of Carter's account of Johnson's statements as hearsay. The government argued that Johnson's statements were not hearsay, but rather were statements against Baker by a co-conspirator in furtherance of the conspiracy. See Fed. R. Evid. 801(d)(2)(E). The district court conditionally allowed the statements under the procedure outlined in United States v. Bell, 573 F.2d 1040, 1044 (8th Cir. 1978) (permitting the district court to conditionally allow testimony concerning a statement of an alleged co-conspirator subject to later proof, by a preponderance of independent evidence, that the declarant was a coconspirator).

Cooperating witness Roscoe Wallace testified that, on one occasion in the fall of 2000, he paid Baker cash for four and one half ounces of crack cocaine in the parking lot of an ice cream shop. Wallace stated that Baker drove an older, white, Cutlass convertible. Wallace stated that before he bought crack from Baker, he had been dealing with a man named Darrell Howard and a man named Ron Hoskins, but that Howard had been arrested, which forced Wallace to find other sources of drugs. Wallace explained that he tried to buy crack from Hoskins when Hoskins had no crack to sell, so Hoskins set up the meeting between Wallace and Baker. According to Wallace, Hoskins told him that Baker would be selling "the same thing that he [Hoskins] had." According to Wallace, Hoskins called Baker a business partner. Finally, Wallace reported that he also dealt with Johnson and that Johnson claimed to be the source of drugs for Baker and Hoskins. Again, Baker objected to the report of Johnson's statements as hearsay, and the district court conditionally allowed the report of Johnson's statements under the Bell procedure.

Although an initial police report described the sale from Baker to Wallace as a sale of powdered cocaine on credit, Wallace insisted that he paid cash and that the purchase involved crack cocaine. The officer who prepared the initial report

regarding Wallace also testified. He explained that the initial report with the reference to powder cocaine resulted from information Wallace volunteered informally at the end of a first interview. This reporting officer said that he took notes of Wallace's ending comments so that he could question Wallace further during a second interview, but that, before he prepared his initial report, he did not fully explore the issues Wallace raised. Finally, the reporting officer testified that when he prepared the initial report, he wrote powder because Wallace initially said only "cocaine," and he assumed Wallace meant powdered cocaine. The reporting officer explained that, in his experience, drug dealers usually use a more specific term if they mean crack cocaine.

The officer's second report–prepared one week after the first report and following a second interview with Wallace–clarified that Wallace described the transaction with Baker as a crack cocaine purchase.

Cooperating witness Darrell Howard testified that he dealt with Baker and Hoskins on multiple occasions between January and June of 2000. He described repeated sales between himself and Baker and Hoskins as "accommodation" sales between dealers. He explained that, when he was out of cocaine, he purchased from Baker and Hoskins, and that when Baker and Hoskins were out, they purchased from him. He described a meeting in his truck when he purchased one half kilogram of powdered cocaine from Baker and Hoskins for resale as powdered cocaine. Howard explained that he handed money to Hoskins and Hoskins handed the money to Baker. Howard then described a second sale of one half kilogram of powdered cocaine to Baker and Hoskins at Hoskins's home. In addition, Howard described two purchases of powdered cocaine from Baker and Hoskins. The first purchase occurred at Hoskins's home and involved one half kilogram. Howard specifically stated that Baker was merely present for this sale and did not handle the money or the cocaine. Howard's second purchase of powdered cocaine from Hoskins and Baker involved the purchase of a full kilogram of powdered cocaine for twenty-five thousand dollars.

-5-

Howard claimed that this second purchase took place in a car, in a parking lot. Hoskins could not identify the location of the parking lot with certainty. Finally, Howard testified that he purchased powdered cocaine from Hoskins when Baker was not present, but that he never dealt solely with Baker.

Cooperating witness Adrian Murphy testified that he purchased powdered cocaine from Baker for the eight to nine month period immediately preceding Murphy's arrest and incarceration on March 10, 2000. Murphy claimed that he met with Baker a couple of times a week during this period and purchased about two or three ounces of powdered cocaine at each meeting. Murphy testified that he met with Baker at car washes and at the barber shop where Baker worked. Murphy further testified that Baker drove an older-model, white, convertible Oldsmobile. Murphy testified that he paid Baker cash, originally nine hundred dollars per ounce, but that Baker eventually lowered the price to eight hundred and fifty dollars per ounce. Murphy testified that he cooked the powdered cocaine he purchased from Baker into crack cocaine for resale and that Baker knew this fact. Murphy testified that on "one occasion" the powdered cocaine he received from Baker did not produce the expected amount of crack cocaine and, when he complained to Baker, Baker gave him extra powdered cocaine for free to make up for the shortage. Murphy stated that Baker was a good supplier and that he would have continued to rely on Baker but for the March 10, 2000 arrest. Finally, Murphy testified that he also dealt with Wallace.

Regarding the price quoted above, Officers testified generally about cocaine prices and weight conversions. In particular, one of the Officers noted that price adjustments often reflect the nature of the relationship between a buyer and a seller, such as history, reliability, quantity, etc.

Baker's attorney aggressively attacked the credibility of each of the cooperating witnesses. The jury received the witnesses' plea agreements and heard of their incentives to testify and their hopes for reduced sentences. In addition,

Baker's attorney identified numerous instances of inconsistencies between the cooperating witnesses' testimony and their earlier statements to police, as well as numerous instances of witness confusion regarding the dates of certain events. Cherie Carter admitted that she had been described as a crack fiend, that she worked as a prostitute for Gary Johnson, had a child with Johnson, sold crack cocaine for Johnson, and used her own teenage son to sell crack cocaine. The jury heard, as explained above, that an early police report described Roscoe Wallace's drug purchase from Baker as involving powdered cocaine on credit rather than crack cocaine for cash. In addition, the jury heard that most of the cooperating witnesses had committed crimes while on parole or supervised release and had lied to their parole officers.

The jury also heard Adrian Murphy describe confusing and contradictory versions of the time line for his dealings with Baker. On direct examination, Murphy stated that he was serving a 235 month sentence on an arrest that occurred in 1999. Murphy later acknowledged that he was mistaken and that the arrest occurred on March 10, 2000. In fact, the arrest did occur on March 10, 2000. Murphy claimed that he met Baker in prison, in Yankton, South Dakota, in 1996. He then stated that he started dealing with Baker in the time frame of 1998-1999 when Baker stopped him on the street in Omaha. Next, he stated that he stopped dealing with Baker in October of 1999. However, he later contradicted himself and claimed that his dealing with Baker occurred in the eight to nine months prior to his March 10, 2000 arrest.

On cross examination, Baker's attorney pressed Murphy for specific dates and explored a possible inconsistency in Murphy's claims regarding how often powdered cocaine from Baker did not cook-up as expected. In addition, he emphasized the fact that Murphy hoped to gain a reduced sentence by testifying against Baker. Regarding specific dates, Baker's attorney explored Murphy's statement that dealings with Baker ended in October of 1999 and that dealings with Baker occurred between the summer of 1998 and the summer of 1999. Finally, Baker's attorney challenged

Murphy's recollection of dates by pointing out dates when Baker was in prison and unavailable to sell to Murphy.

Regarding Murphy's claims that Baker supplemented Murphy's powdered cocaine supply for free when it failed to produce the expected amount of crack cocaine, Baker's attorney pointed out that Murphy claimed both that it occurred on "one occasion" and that it occurred more than one time. Murphy explained that, although he testified that this happened on one occasion, he did not mean it only occurred one isolated time. Instead, Murphy explained, he meant it occurred in one general window of time. Finally, Baker's attorney emphasized for the jury the fact that Murphy was serving a sentence of nearly twenty years and that by testifying for the government, Murphy hoped the government would recommend a sentence reduction.

At the close of the government's case, Baker made a motion for directed verdict pursuant to Fed. R. Crim. P. 29(a). Ultimately, the district court reserved ruling on the Rule 29 motion until after the jury returned a verdict. See Fed. R. Crim. P. 29(b) ("The court may reserve decision on the motion, . . ., submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty . . ."). As part of the discussion of the Rule 29 motion, the district court also discussed at some length the issue of whether the statements conditionally allowed under Bell would be admitted.

The district court ruled that the government failed to prove by a preponderance of the evidence that there was a conspiracy between Johnson, Carter, Wallace and Baker. Consequently, any testimony by Wallace and Carter concerning statements made by Gary Johnson was stricken. The government does not appeal those evidentiary rulings.

The court went on to rule that the government had shown by a preponderance of the evidence that there was a conspiracy between Baker, Wallace, and Howard. Accordingly, the objection to co-conspirator testimony, as it related to this particular conspiracy, was overruled. Wallace's statements linking Baker, Wallace, Howard, and Hoskins were not stricken.

Finally, although the district court had not conditionally allowed any statements by Murphy under the Bell procedure, the district court stated that the government failed to prove by a preponderance of the evidence that there was a conspiracy between Murphy and Baker.

The jury found Baker guilty under Counts I and III (conspiracy and felon-in-possession of a firearm), but not guilty under Count II (use of a firearm in furtherance of the conspiracy). The jurors were not asked to specify who they determined to be Baker's co-conspirators. The district court refused to accept the verdict as to Count I, but accepted the verdicts as to Counts II and III. The district court declared its decision rested on credibility determinations and specifically held that certain testimony from cooperating witnesses was infirm as a matter of law and could not be accepted by reasonable jurors absent corroboration.

The district court stated:

With respect to count one, there was only a certain amount of testimony that was relevant to whether this was a conspiracy for crack cocaine. There was no baking soda found, no baggies, no great amount of money that was found with respect to the defendant. *The testimony of Cheri Carter lacks credibility in all respects, until and unless is was expressly corroborated by law enforcement.* And those facts only corroborated her relationship with Gary Johnson and his participation at some level in a conspiracy to distribute narcotics. The extent of her dealings is doubtful, even with Gary Johnson. And the extent of her dealings with the defendant, Mr. Baker, in this matter is without merit.

*With respect to Roscoe Wallace, Roscoe Wallace's credibility concerning crack cocaine versus powder cocaine, in my opinion, is not reliable and could not be relied on by the jury, specifically as it relates to the difference between crack cocaine and powder cocaine in that he hasn't been able to keep his story straight concerning that with the police officers.* He specifically retold the police, reporting officer, that he made a deal with Baker at Mary Queen for cocaine. The exact date is not clear. Apparently it's during the conspiracy. The officer indicated that most informants specifically identify if a drug transaction has to do with crack cocaine or not and Wallace specifically said it involved cocaine; the officer therefore believed that it was powder cocaine, which is appropriate under the circumstances. It was only later that Mr. Wallace said that it was crack cocaine, and *given the huge motivation to fabricate such testimony that results from motions for downward departure and Rule 35 by the government I think his testimony is unreliable as a matter of law*.

*With respect to Darrell Howard, Darrell Howard never bought any cocaine from Mr. Baker.* He bought cocaine from Mr. Hoskins, and the only testimony was that he bought powder cocaine, not crack cocaine. There very well may be another conspiracy, but its not for crack cocaine.

*With respect to Adrian Murphy, Adrian Murphy, based on my recollection of the testimony, has no idea when he was dealing with the defendant as far as the time of this conspiracy.* In fact, the time of the conspiracy, he was thrown in jail in March of 2000, which is the very beginning of the conspiracy that's alleged in the government's superceding indictment, and it's unlikely that it occurred during that time frame. *So I don't think that a reasonable jury under the circumstances could find that Adrian Murphy's dealings with Mr. Baker had anything to do with the conspiracy alleged herein.*

For the record, it appears that the government's entire theory of the case has to do with Mr. Johnson, and no one else, and all the rest of the testimony was basically collateral to show that Mr. Baker was involved in a conspiracy with Mr. Johnson. Mr. Murphy was basically an

-10-

afterthought, and given the nature of the conspiracy indictment, as it's drawn, it is so indefinite as to render it nearly unconstitutional with respect to specificity.

*The government never put any evidence on that showed Mr. Baker was in possession of any crack cocaine.* The only cocaine that was found was in the trash of a home in which he lived, and that was powder cocaine; not crack cocaine. The cocaine found in the garage was powder cocaine and not crack cocaine. *There is no credible evidence that Mr. Baker ever participated in a crack cocaine conspiracy.* I'll grant there is evidence he participated in cocaine conspiracy, and the difference between the two is critical in any analysis in this case. Given the tenor of the prosecution, especially in closing argument, and given the confusion with respect to what is powder and what is crack throughout the government's case, it is not unlikely that a jury would confuse the two and not understand the significance of a conspiracy to distribute crack cocaine as opposed to a conspiracy to distribute cocaine. For that reason I'm dismissing count one of the indictment.

(Emphasis added).

The government objected and shortly thereafter appealed to this court. We remanded for sentencing on Count III and for other proceedings that the district court might conduct as to the remaining counts. On remand, the district court requested briefing on various issues including: (1) whether it should grant a new trial on Count I in lieu of its judgment of acquittal, (2) whether it could decide witness credibility as a matter of law as to either competence or reliability, (3) whether corroboration is required to accept as credible the testimony of confidential informants or co-conspirators, and (4) whether reliance on hearsay statements related to co-conspirator conversations that the witnesses heard regarding Baker's culpability raised Confrontation Clause concerns. On reconsideration, after submission of the parties' post-trial briefs, the district court allowed its earlier judgment to stand.[1]

---

[1]Although the issue of a new trial is not presently before the court, we note that after the district court entered its judgment of acquittal, Baker's attorney advised the

The government appeals, arguing that the district court conducted impermissible credibility determinations when it rejected the jury verdict as to Count I. Baker, in turn, argues that the district court correctly rejected the jury verdict as to Count I because the evidence was insufficient as a matter of law, culpability rested on hearsay statements, and any credibility determinations by the district court were permissible because the particular witnesses were so unreliable as to be infirm as a matter of law. Because the evidence taken in a light most favorable to the jury's verdict is sufficient to support the jury's verdict as to Count I based on a conspiracy between Baker and Murphy, or a conspiracy between Hoskins, Wallace, Baker, and Howard, we reverse.[2]

III.

A district court has very limited latitude in ruling upon a motion for judgment of acquittal. A motion for judgment of acquittal should be granted only where the evidence, viewed in the light most favorable to

_____

court that a new trial could not be granted because of double jeopardy concerns. The government agreed and also advised the district court that the time period for granting a new trial had passed. Had the district court entered a judgment of acquittal prior to the jury's return of a guilty verdict, these positions clearly would have been correct. It is not clear to us, however, that double jeopardy concerns would have prevented a grant of new trial when Baker still faced the risk that we might reinstate the jury's verdict. Nevertheless, because Baker did not request a new trial below nor raise this issue on appeal, we cannot now address this issue.

[2]Since the court did not grant the Rule 29 motion before return of the verdict, and because the district court's ruling as to the existence of certain conspiracies related only to its evidentiary rulings, we may review the entire scope of the conspiracy, including the allegations of a conspiracy between Baker and Johnson or Baker and Murphy. However, even limiting the conspiracy to one between Baker, Wallace, Howard, and Hoskins, there is sufficient evidence from which a jury could conclude, beyond a reasonable doubt, that a conspiracy existed and that it involved more than fifty grams of crack cocaine.

-12-

the government, is such that a reasonably minded jury must have a reasonable doubt as to the existence of any of the essential elements of the crime charged. "The evidence need not exclude every reasonable hypothesis except guilt; the essential elements of the crime may be proven by circumstantial as well as direct evidence." This standard of review applies both to appeals from the denial and the grant of a motion for judgment of acquittal. In ruling upon a motion for judgment of acquittal, the district court is not to weigh the evidence or assess the credibility of witnesses. This narrowly-constricted power of review is in contrast to the district court's broad discretion in ruling upon a motion for new trial.

United States v. Bennett, 956 F.2d 1476, 1481 (8th Cir. 1992) (quoting United States v. Nabors, 762 F.2d 642, 653 (8th Cir. 1985)). Applying this standard, we find that the district court made impermissible credibility determinations and that a reasonable jury could have found beyond a reasonable doubt that Baker conspired to distribute fifty grams or more of crack cocaine.

Regarding the issue of credibility, the district court improperly discounted the testimony of Cheri Carter, Roscoe Wallace, Darrell Howard, and Adrian Murphy. The fact that these witnesses testified in exchange for the possibility of reduced sentences does not categorically make their testimony infirm or require that their testimony be corroborated in order to support a conviction. See United States v. Maggard, 156 F.3d 843, 847 (8th Cir. 1998) (discussing cooperating witnesses who testified under plea agreements, and stating, "The jury's choice to credit the testimony of those witnesses was within its province, and we uphold the conviction if substantial evidence supports it."); United States v. Martinez, 958 F.2d 217, 218 (8th Cir. 1992) ("The jury was aware of [the witness's] cooperation with the government, of the potential for a reduction of his sentence in exchange for his assistance, and of his extensive criminal record. They were free to give whatever weight they chose to his testimony. It is the sole province of the jury to weigh the credibility of a witness.").

-13-

Regarding these witnesses, an Officer did corroborate Wallace's testimony; Darrel Howard did testify that he purchased powdered cocaine from Baker; and Cheri Carter specifically described how she assisted in a sale of crack cocaine from Johnson to Baker. Baker's counsel repeatedly made these witnesses' potential infirmities clear. It was the jury's job to determine whether these witnesses could be trusted.

Similarly, the jury was free to accept Murphy's testimony notwithstanding his apparent confusion regarding dates. Murphy's testimony did contain inconsistencies. However, the government rehabilitated Murphy on the initial direct examination when Murphy made clear that his dealings with Baker went on for eight to nine months and ended with Murphy's arrest. The jury heard that Baker was released from a half-way house approximately nine months prior to Murphy's arrest. Inconsistencies in Murphy's recollection of dates did not make his testimony wholly incredible. His testimony simply did not contain the type of claims that take fact-finding outside the province of the jury and permit factual determinations as a matter of law. See United States v. Hernandez, 13 F.3d 248 (7th Cir. 1994) (holding testimony incredible as a matter of law where the testimony described an actual physical impossibility under the laws of nature); United States v. Blas, 947 F.2d 1320 (7th Cir. 1991) (holding testimony incredible as a matter of law where it was physically impossible for the witness to have observed what he or she claims to have witnessed).

Finally, the jury was free to accept Murphy's testimony even though he was arrested less than two months after the start of the period charged in Baker's indictment. The indictment charged a conspiracy "on or about February 1, 2000, through on or about June 30, 2001." Acts that occur shortly before the beginning of the charged period are relevant. See United States v. Harris, 344 F.3d 803, 804 (8th Cir. 2003) (per curiam) (holding that the "on or about" language in an indictment put a defendant on notice that evidence of his commission of a crime shortly before the time stated in the indictment could be used to support a conviction). This is especially true when the acts continue into the period charged. Further, the

-14-

government was not required to prove that Baker was involved in a conspiracy that filled the entire period charged. See id. ("a variance between the date set forth in the indictment and the proof at trial is not fatal as long as the acts alleged were committed within the statute of limitations and before the date of the indictment." (citing United States v. Stuckey, 220 F.3d 976, 982 (8th Cir. 2000))); see also United States v. Heimann, 705 F.2d 662, 667 (2d Cir. 1983) ("Since the fraudulent scheme that the government proved against Heimann fell within the period charged in the indictment, we conclude that there was no fatal variance."); United States v. Davis, 679 F.2d 845, 852 (11th Cir. 1982) ("Neither is time an essential element so long as the time frame proved was within the period alleged in the indictment.").

Regarding the sufficiency of the evidence, we must take the evidence in a light most favorable to the verdict. Accordingly, we must assume that the jury chose to accept Murphy's claim that he dealt with Baker through March 10, 2000. Murphy also made clear that Baker knew the repeated sales of powdered cocaine were for cooking and redistribution as crack cocaine. In fact, Murphy made clear that Baker *accommodated* Murphy, a buyer of substantial quantities, by discounting his price and by giving additional powdered cocaine to make up for a shortage in the quantity of crack cocaine produced.

Other testimony, accepted as credible and viewed in a light most favorable to the jury's verdict, showed that Baker, with Hoskins, was involved in the sale and purchase of one half kilogram quantities of powdered cocaine to and from Howard, that Baker sold a resale quantity of crack cocaine to Wallace, that Hoskins cooperated with Baker to facilitate the sale to Wallace, and that Baker, on at least one occasion, received two ounces–more than fifty grams–of crack cocaine from Johnson. Finally, the discovery of baggies with cocaine residue and wrappers for kilogram bricks of cocaine in Baker's garage reinforce this testimony.

As the foregoing makes clear, this is not the case of an isolated sale or isolated, uncorroborated testimony about a defendant's association with substantial quantities

of drugs or particular co-conspirators. The jury easily could have found that the evidence of powdered cocaine sales, the cocaine packaging found in Baker's garage, and evidence of a crack cocaine sale to Wallace, tended to make each cooperating witness's testimony more credible than it might have been had any one of the witness's testimony been the only evidence against Baker.

We reverse the judgment of the district court and remand for reinstatement of the jury's verdict on Count I and for sentencing on Count I.

_____