**UNITED STATES of America,
Plaintiff,**

v.

**Raymond H. WIRTZ, Defendant.**

**No. CRIM.04–18(3)(PAM/RL).**

United States District Court,
D. Minnesota.

Feb. 22, 2005.

Peter B. Wold, Peter B. Wold, PA, Minneapolis, MN, for Defendant.

Henry Joseph Shea, III, US Attorney, Nicole A. Engisch, US Attorney, Minneapolis, MN, for Plaintiff.

## SECOND AMENDED MEMORANDUM AND ORDER

MAGNUSON, District Judge.

On December 1, 2004, this Court issued a Memorandum and Order denying Defendant Raymond H. Wirtz's Motion for a Judgment of Acquittal or a New Trial. The Court now sua sponte strikes that Order and substitutes this Amended Order for the previous Order. For the reasons that follow, the Court denies the Motion.

## BACKGROUND

In January 2004, Defendant was charged with conspiracy to commit mail fraud and mail fraud in violation of 18 U.S.C. §§ 2, 371, and 1341. On October 8, 2004, a jury convicted Defendant of mail fraud but acquitted him of the conspiracy charge. Count Two of the Superseding Indictment, which relates to the mail fraud charge, states:

> Beginning prior to 1985, and continuing until in or about June 2000, in the State and District of Minnesota and elsewhere, the defendant, Raymond H. Wirtz, aided and abetted by others, and others not indicted herein, did knowingly and intentionally participate in and devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises.

(Superseding Indictment ¶ 19.) Count Two also alleges one specific act: Defendant mailed a Katun Corporation check dated February 11, 1999, in the amount of $500 to Steve Adams of Xerox Corporation, for the purpose of executing the scheme to defraud. (*Id.* ¶ 20.)

Defendant now asks that the Court either set aside his mail fraud conviction or grant him a new trial.

## DISCUSSION

### A. Standard of Review

 Rule 29 of the Federal Rules of Criminal Procedure provides that a Court may set aside a guilty verdict if the evidence presented at trial is insufficient to sustain a conviction. Fed.R.Crim.P. 29(c)(2). However, the Court "has very limited latitude in ruling upon a motion for judgment of acquittal." *United States v. Baker*, 367 F.3d 790, 797 (8th Cir.2004). The Court cannot weigh the evidence or assess the credibility of witnesses. *Id.* Likewise, if the evidence rationally supports two conflicting hypotheses, the Court will not disturb the conviction. *Ortega v. United States*, 270 F.3d 540, 544 (8th Cir. 2001) (citations omitted). Thus, the Court may grant a judgment of acquittal "only where the evidence, viewed in the light most favorable to the government, is such that a reasonably minded jury must have a reasonable doubt as to the existence of any of the essential elements of the crime charged." *Baker*, 367 F.3d at 797; *United States v. Armstrong*, 253 F.3d 335, 336 (8th Cir.2001).

 The Court may grant a new trial to a defendant "if the interests of justice so require." Fed.R.Crim.P. 33. When ruling on a motion for a new trial under Rule 33, the Court has broader discretion than on a motion for judgment of acquittal under Rule 29. *United States v. Campos*, 306 F.3d 577, 579 (8th Cir.2002). It therefore may "weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict." *White v. Pence*, 961 F.2d 776, 780 (8th Cir.1992). Nevertheless, the Court's discretion is not unfettered. Motions for a new trial based on the weight of the evidence are generally disfavored. *Campos*, 306 F.3d at 579. Thus, the Court must exercise its authority under Rule 33 "sparingly and with caution." *Id.* (quoting *United States v. Lincoln*, 630 F.2d 1313,

1319 (8th Cir.1980)). Unless the Court ultimately determines that a miscarriage of justice will occur, the jury's verdict must stand. *Id.*

### B. Pricing Information

 Defendant first argues that the jury must have misapplied the law by implicitly finding that Xerox pricing information was "property" and therefore covered by the federal mail fraud statute. Mail fraud is the use of the mails in furtherance of a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1341. The federal mail fraud statute is "limited in scope to the protection of property rights." *Cleveland v. United States*, 531 U.S. 12, 18, 121 S.Ct. 365, 148 L.Ed.2d 221 (2000) (citation omitted). Confidential business information is an intangible property right. *Id.* at 19, 121 S.Ct. 365 (citation omitted).

The Court provided the jury with an instruction specifically relating to Xerox pricing information:

> Evidence has been presented that Xerox Corporation retail pricing information and maintenance pricing information was confidential. For the information to constitute "confidential business information" and therefore property, the information must be exclusively used by Xerox Corporation and not be disclosed publicly. If Xerox Corporation was deprived of its right to exclusive use of such information, and had not publicly disclosed the information when Katun Corporation received the information, Xerox Corporation was deprived of property.

Jury Instruction No. 32.

The Court based this instruction on the holding in *Carpenter v. United States*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275

(1987). In *Carpenter*, the defendant was an author of a Wall Street Journal investment advice column. He entered into a scheme with two stockbrokers who, in exchange for advanced information from the reporter as to the timing and contents of the column, bought and sold stocks based on the column's probable impact on the stock market. The stockbrokers then shared their profits with the reporter.

The official policy and practice at the Journal was that prior to publication, the contents of the column were the Journal's confidential information. The United States Supreme Court held that information that has yet to be disclosed to the public is "property" as defined under the mail fraud statute. It reasoned:

> The Journal had a property right in keeping confidential and making exclusive use, prior to publication, of the schedule and contents of the ... column.... The confidential information was generated from the business, and the business had a right to decide how to use it prior to disclosing it to the public.... It is sufficient that the Journal has been deprived of its right to exclusive use of the information, for exclusivity is an important aspect of confidential business information.

*Id.* at 26–27, 108 S.Ct. 316.[1]

Defendant argues that no reasonable jury could find that the Xerox pricing information contained in Exhibits 2A–D and 17A–B was confidential. He maintains that Xerox did not consider the information confidential because it did not mark these documents "confidential" as required by Xerox policy. In addition, Defendant argues that Xerox widely distributed the pricing information contained in those exhibits to its customers. Defendant also points out that the Xerox customers were not contractually bound to maintain confidentiality, and that Xerox made no efforts to ensure that the information remained exclusive. Thus, according to Defendant, once Xerox produced the retail sales and maintenance price lists to its customers, the information was no longer confidential.

 The Court agrees that the information was no longer confidential once Xerox disclosed the information to its customers. However, confidential business information for the purposes of the mail fraud statute can include information that, although it will shortly be disclosed by its owner and will be placed in public domain, is property until that disclosure. Several witnesses testified about the timeliness of the information that Katun received and of the value inhered in such timely information. (*See, e.g.,* Adams Tr. at 13–14 (testifying that he sent Katun the pricing information as soon as he received updates); Becker Tr. at 159 (admitting that he passed Xerox pricing information to Xerox competitors who apparently did not have access to the information); Clarke Tr. at

---

**1.** The United States Supreme Court has held that property interests are created and defined by state law. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1001, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984). Minnesota courts have not expressly defined the term "confidential business information" as *Carpenter* used it. *Minnesota v. Philip Morris Inc.*, 606 N.W.2d 676, 688 (Minn.Ct.App.2000). However, in *Philip Morris*, the Minnesota Court of Appeals addressed whether the release of "confidential business information" was a compensable taking, and adopted the definition of a trade secret as information that has "independent economic value as a result of its not being generally known or readily ascertainable by persons who can make use of the information." *Id.* Conversely, information that is placed in the public domain or otherwise readily ascertainable by the public is not a trade secret. *Strategic Directions Group, Inc. v. Bristol–Myers Squibb Co.*, 293 F.3d 1062, 1065 (8th Cir.2002). These cases are consistent with the finding that information that has not been disclosed to the public are a property interest.

19 (explaining that pricing information was not readily available when Katun received it).) Based on that testimony, a jury could reasonably conclude that Xerox had not yet publicly disclosed the information when Katun received the information. Thus, the jury's implicit finding that the information was confidential business information until Xerox publicly disclosed the information is consistent with *Carpenter.*

Furthermore, Exhibit 2 contains apparently confidential information, as it is marked private.[2] Defendant argues that the Court erred in admitting Exhibit 2 because the Government failed to establish adequate foundation. Specifically, Defendant contends that Larry Stroup, the witness who introduced Exhibit 2, had no personal knowledge of the source of Exhibit 2.

■■■ Federal Rule of Evidence 602 provides that a "witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter." The foundation requirement of personal knowledge need not be proved by the witness's own testimony. *See Fortier v. Dona Anna Plaza Partners,* 747 F.2d 1324, 1332 (10th Cir.1984) (although witness who retained report lacked independent knowledge of the circumstances surrounding the making of the report, another witness identified the report and testified about its contents). Furthermore, personal knowledge can include "inferences and opinions, as long as they are grounded in personal observations and experience." *United States v. Rodriguez,* 162 F.3d 135, 144 (1st Cir.1998) (quoting *United States v. Neal,* 36 F.3d 1190, 1206 (1st Cir.1994)).

■■■■■■. A witness may testify about his opinions or inferences if they are rationally based on the perception of the witness and aid the jury in understanding the witness's testimony or the determination of a fact. *See* Fed.R.Evid. 701. Rule 701 permits such testimony if it is based on "relevant historical or narrative facts that the witness has perceived." *United States v. Espino,* 317 F.3d 788, 797 (8th Cir.2003). "While the ordinary rule confines the testimony of a lay witness to concrete facts within his knowledge or observation, the Court may rightly exercise a certain amount of latitude in permitting a witness to state his conclusions based upon common knowledge or experience." *Id.* (citation omitted). "The general application of Rule 701 indicates that a lay witness may testify about facts within his or her range of generalized knowledge, experience, and perception." *Id.*

Stroup testified that he personally received Exhibits 2 and 2A–D from the internal mail distribution system at Katun. He further testified that he believed the original source of the documents was either Steve Adams of Jack Lafferty, Xerox employees who provided the pricing information to Katun in exchange for payments. Stroup based his conclusion on his experience that "we weren't getting pricing information from anyone else." (Stroup Tr. at 20.)

The Court recognizes that several pieces of evidence contravene his assumption. First, Stroup admitted that he never had any personal contact with either Adams or Lafferty, and that neither sent pricing information directly to him. (*Id.* at 21.) Second, Adams testified that he was almost certain that he did not send Exhibit 2 to Katun because the document was

---

2. In addition, Xerox managers testified that Xerox did not publicly disclose maintenance price lists, such as Exhibit 17A. (Minnis Tr. at 36; Wenger Tr. at 66.) Rather, the maintenance prices were provided only to Xerox's customers. (Minnis Tr. at 36.)

marked as private, and did not send Exhibits 2B and 2D because Katun was not interested in that information. (Adams Tr. at 16–17, 22.) Third, Stroup admitted that Michael Clarke received highly confidential documents from Xerox officials other than Lafferty and Adams, and that the pricing information could have come from those individuals. (Stroup Tr. at 21–23.)

· Nevertheless, the Government presented adequate foundation to admit Stroup's testimony that Exhibit 2 came from either Adams or Lafferty. First, Stroup testified that he stored Exhibits 2 and 2A–D in one file folder. (*Id.* at 19.) In addition, he testified that Exhibit 2 and Exhibits 2A–D all contained pricing information that became effective on March 1, 1992, indicating that he received all of the documents at one time. (*Id.* at 24–25.) Finally, Adams admitted that he sent Exhibits 2A and 2C to Defendant. (Adams Tr. at 15–16.) Consequently, Stroup's lay opinion was more than a bare assertion as to the source of Exhibit 2.

Based on Stroup's opinion, the jury could reasonably infer that Exhibit 2 and Exhibits 2A–D were sent together from one source—Steve Adams—pursuant to his scheme with Defendant, who then forwarded the information to Stroup.[3] Viewing the evidence in the light most favorable to the Government, the Court concludes that the jury had sufficient evidence from which to conclude that Xerox

had not publicly disclosed its pricing information when Katun received it, and that Katun received Exhibit 2 in furtherance of the mail fraud scheme. Likewise, the Court finds no miscarriage of justice based on the jury's finding. Accordingly, the Court will not disturb the jury's verdict on this point.

## C. Duplicity of Count Two

Defendant next argues that Count Two was duplicitous and therefore should not have been submitted to the jury. Defendant previously raised the same objection to Count One, alleging that it identified two, distinct conspiracies. Although the jury acquitted Defendant of Count One, Defendant now argues that the jury may have inferred that more than one mail fraud scheme occurred based on the overall allegations in the Superseding Indictment.[4]

 An indictment is duplicitous if it joins in a single count two or more distinct and separate offenses. *United States v. Street,* 66 F.3d 969, 974 (8th Cir.1995) (citing *Gerberding v. United States,* 471 F.2d 55, 59 (8th Cir.1973)). "The principal vice of a duplicitous indictment is that the jury may convict a defendant without unanimous agreement on the defendant's guilt with respect to a particular offense." *Id.* (quoting *United States v. Karam,* 37 F.3d 1280, 1286 (8th Cir.1994)).

---

**3.** Defendant also argues that the admission of Exhibit 2 violated Federal Rule of Evidence 403 because the danger of unfair prejudice and confusion substantially outweighed the probative value of the Exhibit. He contends that the only inference the jury could make was that Adams sent Exhibit 2 to Katun, and that there is no evidence in the record to support this finding. The Court disagrees. As explained above, sufficient evidence supported the conclusion that Adams sent Exhibit 2 to Katun in furtherance of the mail fraud scheme, and Stroup's testimony was clearly probative of that issue.

**4.** The Government argues that Defendant waived his right to challenge Count Two as duplicitous. However, Defendant raised the duplicity argument before the Court in a pretrial argument relating to whether the Superseding Indictment charged Defendant with one or two mail fraud schemes. Count Two incorporates all allegations made in Count One. (*See* Superseding Indictment ¶ 18.) Accordingly, the Court finds that Defendant did not waive the duplicity argument.

Although Count Two incorporates the allegations contained in Count One, Count Two clearly sets forth only the offense of mail fraud. Indeed, the fact that the jury acquitted Defendant of Count One but convicted him of Count Two indicates that the jury differentiated between the two offenses, as well as the acts associated with each offense. Accordingly, the Court denies Defendant's Motion to strike Count Two as duplicitous.

### D. *Brady* Material

At the beginning of this trial, the Court admonished the Government for its alleged failure to disclose all exculpatory evidence to Defendant during the trial of *United States v. Kerry Baubie and Raymond Wirtz*, Crim. File No. 04–169 ("commercial airlines fraud trial"). (*See* September 24, 2004, Order at 4.) The Court recognized that Defendant was acquitted of the charges in the commercial airlines fraud trial, notwithstanding the Government's alleged failure to disclose the allegedly exculpatory evidence. Because of the acquittal, the alleged *Brady* violation did not occur in the commercial airlines fraud trial. *See United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (evidence is material for purposes of *Brady* analysis if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different); *see also Kyles v. Whitley*, 514 U.S. 419, 432–37, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (explaining the materiality standard). Nevertheless, the Court was concerned that the Government would employ the same alleged tactics in this case, and therefore ordered the Government to disclose all interview notes, testimony, and inducements of every individual the Government contacted during the course of its investigation relating to the charges in this matter. (*See* September 24, 2004, Order at 4.)

Defendant now argues that the Government violated *Brady* by suppressing exculpatory evidence in this case. Specifically, he states that the Government continued to interview witnesses throughout this trial, but failed to turn over interview notes. He also argues that the Government failed to disclose that it threatened witnesses. As an example, Defendant points to the testimony of Neal Becker, who stated that he was intimidated by the Government and that the Government re-created some of his memories. (Becker Tr. at 167–68.) The Government responds that all potentially exculpatory information was elicited at trial, and adamantly states that it has not withheld any information that would potentially qualify as *Brady* material.

The Court takes all allegations of *Brady* violations very seriously. As explained by the United States Supreme Court in *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), prosecutors have a responsibility to promote justice, and adherence to proper methods in seeking a conviction is part of that duty:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions ... are apt to carry much weight against the accused when they should properly carry none. *Id.* at 88, 55 S.Ct. 629. The Court looks upon all allegations of prosecutorial misconduct very seriously.

 Nevertheless, the Court finds that Defendant has not presented conclusive evidence that the Government did indeed suppress *Brady* material. For example, Defendant has no evidence that the substance of the interviews that occurred while trial was pending revealed any exculpatory evidence. In addition, the Government notes that all witnesses who were interviewed during trial also testified at trial, and all potentially exculpatory evidence was elicited then. *See Nassar v. Sissel,* 792 F.2d 119, 121 (8th Cir.1986) (*Brady* does not require pretrial disclosure as long as ultimate disclosure is made "before it is too late for the defendant to make use of any benefits of the evidence"). The Court notes the jury was permitted to hear the evidence relating to the Government's alleged tactics towards Becker, and could therefore weigh his credibility accordingly. The Court cannot hold that the Government violated *Brady* based on Defendant's mere assumptions given the manner in which the Government prosecuted this case.

## CONCLUSION

Viewing the light most favorable to the Government, the Court finds that sufficient evidence existed to convict Defendant of mail fraud. The Court also finds insufficient evidence to support a finding that upholding the conviction will result in a miscarriage of justice. Accordingly, Defendant's Motion for Judgment of Acquittal or New Trial (Clerk Doc. No. 193) is **DENIED.**