# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-3836

_____

United States of America,

        Appellee,

v.

Modesto Guzman-Tlaseca,

        Appellant.

\*
\*
\*
\*  Appeal from the United States
\*  District Court for the
\*  District of Minnesota.
\*
\*
\*
\*

_____

Submitted: June 9, 2008
Filed:  November 17, 2008

_____

Before MURPHY, BYE, and SHEPHERD, Circuit Judges.

SHEPHERD, Circuit Judge.

On February 13, 2007, a federal grand jury indicted Modesto Guzman-Tlaseca, and co-defendants Francisco Lee Sifuentes, Roberto Sanchez Garciduenos, and Erika Janette Placensia on a charge of conspiring to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(A), and 846. The district court[1] denied Guzman-Tlaseca's pretrial motion to suppress evidence. A jury convicted Guzman-

_____

[1]The Honorable James M. Rosenbaum, United States District Judge for the District of Minnesota.

Tlaseca, and the district court sentenced him to 264 months of imprisonment. Guzman-Tlaseca appeals the denial of his motion to suppress, his conviction, and his sentence.

## I.

Law enforcement investigated Guzman-Tlaseca for a one and one-half year period before his arrest in January, 2007. Drug Enforcement Administration ("DEA") Special Agent Jeffrey J. Fiance ("SA Fiance") was the affiant for the warrants in question and testified at the evidentiary hearing on Guzman-Tlaseca's motion to suppress evidence. At the time of the arrest, SA Fiance had been in law enforcement for eight years and an agent for the DEA for six years. In his affidavit, he stated that the DEA, Immigration and Customs Enforcement ("ICE") and the Anoka-Hennepin Drug Task Force ("AHDTF") had been investigating a drug trafficking ring called the "Guzman-Tlaseca Drug Trafficking Organization" ("DTO"). He averred that on July 6, 2005, police executed a search warrant on Guzman-Tlaseca's home on 55th Street in Minneapolis ("55th Street residence"). They found approximately 3 ounces of methamphetamine, a digital scale, and $158 of pre-recorded buy funds, which the AHDTF had previously used to buy narcotics from Guzman-Tlaseca. He was arrested, but not charged, because of an investigation into his ongoing criminal activity.

SA Fiance also related in his affidavit the facts surrounding controlled purchases of narcotics from Guzman-Tlaseca during April and May, 2006. A confidential informant, CS-1, purchased methamphetamine from Guzman-Tlaseca at a separate residence on 27th Avenue in Minneapolis ("27th Ave. house") on May 5, 2006 and May 17, 2006. An undercover DEA agent accompanied CS-1 on the May 17, 2006 purchase.

Another informant, CI-1, purchased methamphetamine from Guzman-Tlaseca at the 27th Ave. house on April 26, 2006, and at the 55th Street residence on April 27, 2006 and April 28, 2006. On the last two occasions, undercover DEA agents accompanied CI-1. DEA agents also monitored the April 27, 2006 transaction through an electronic listening device that CI-1 was wearing.

In November 2006, CS-1 informed law enforcement that Guzman-Tlaseca had rented a residence in Richfield, Minnesota ("Richfield residence") that was possibly being used to store and coordinate the distribution of methamphetamine. DEA and ICE special agents had already identified the Richfield residence as a suspected "drug stash location" for the DTO. SA Fiance stated in his affidavit that this was further corroborated by other subjects of the investigation.

SA Fiance averred that on December 19, 2006, Minnesota Bureau of Criminal Apprehension Special Agent Ron Woolever ("SA Woolever"), purchased approximately five ounces of methamphetamine from co-defendant Garciduenos in an undercover capacity. Information obtained from Garciduenos led to the arrest of Ruben Rodriguez Navarez, who stated that a man he knew as "Rey" had given him a phone to use.[2] During searches of the vehicles driven by Navarez and Garciduenos, two cellular telephones were seized. SA Woolever identified a common number in these two phones. When he called the number, a man who identified himself as "Rey" answered, and then handed the phone to a woman later identified as co-defendant Placensia. After several conversations, Placensia agreed to meet SA Woolever and deliver to him a half pound of methamphetamine.

On December 29, 2006, SA Woolever met with Placensia and arrested her after the purchase of one-half pound of suspected methamphetamine. She subsequently informed SA Woolever that "Rey" was the source of the methamphetamine that she

[2]Rey's full name is Reyner Diaz Figueroa.

and Garciduenos sold to him. On December 29, 2006, accompanied by special agents from the Minnesota Bureau of Criminal Apprehension, Placensia identified Guzman-Tlaseca's Richfield residence as Rey's "stash house." She indicated that she had seen methamphetamine at the Richfield residence within 48 hours of December 29, 2006, and she identified a man outside the residence as "Rey." She also picked Guzman-Tlaseca's photograph out of a photographic array and identified him as someone she had seen at the Richfield residence giving money to "Rey."

On January 17, 2007, SA Fiance applied for search warrants to search the Minneapolis and Richfield residences. He requested authority to search the 55th Street residence for documents relating to the transportation, distribution and manufacturing of narcotics. In support of his affidavit, SA Fiance wrote, in his own handwriting, that "[a]s of December 2006, your affiant has information received from a CRI that detailed drug ledgers were being kept at the residence located at 4122 55th, Minneapolis, MN." For the Richfield residence, he requested the authority to search for controlled substances, narcotics trafficking paraphernalia, and documents or other written evidence relating to the transportation, ordering, purchase or distribution of controlled substances. The affidavits supporting the two warrants were nearly identical, the only difference being that SA Fiance did not include the handwritten notation in the affidavit supporting the warrant to search the Richfield residence.

During the execution of the warrant for the search of the 55th Street residence, law enforcement discovered folded currency containing a white powder that field tested positive for methamphetamine. A search of the basement uncovered other items consistent with a narcotics operation, such as heat-sealed bags that had been opened, unused ziplock bags, and a white powdery substance that appeared to be cut material used to increase the volume of controlled substances. SA Fiance applied for and received a second warrant to search the 55th Street residence based on these discoveries.

The prosecution introduced into evidence items discovered during these searches. From the 55th Street residence, the prosecution introduced a Derringer pistol, ammunition, documents belonging to co-defendant Sifuentes, and a small amount of methamphetamine. From the Richfield residence, the government introduced two driver's licenses belonging to Guzman-Tlaseca, some paperwork belonging to him, and approximately 30 grams of methamphetamine.

Guzman-Tlaseca filed a motion to suppress the evidence obtained during the searches of his two residences, claiming that the searches were not supported by probable cause. After an evidentiary hearing, the magistrate judge[3] recommended the denial of the motion. The district court adopted the recommendation and denied the motion to suppress. The United States filed an information to establish a prior felony drug conviction of Guzman-Tlaseca and enhance his mandatory minimum sentence pursuant to 21 U.S.C. § 851.

At trial, more evidence was introduced concerning Guzman-Tlaseca's participation in the drug conspiracy. Government informant Scott Groff testified that, prior to his October 14, 2005 arrest, he had been dealing drugs with Guzman-Tlaseca for approximately six months. After Groff's arrest, he cooperated with law enforcement, and engaged in controlled buys of narcotics from Guzman-Tlaseca and co-defendant Sifuentes on October 14, 2005; October 18, 2005; and November 15, 2005. He also testified that he helped Guzman-Tlaseca and Sifuentes acquire methamphetamine on one occasion in mid-2005. Sifuentes also testified about Guzman-Tlaseca's drug trafficking activities.

On June 20, 2007, the jury returned a verdict of guilty. As a result of a prior felony drug conviction, Guzman-Tlaseca's mandatory sentence was 20 years. See 21

---

[3]The Honorable Franklin L. Noel, United States Magistrate Judge for the District of Minnesota.

U.S.C. § 841(b)(1)(A)(viii). The Presentence Investigation Report ("PSR") recommended a base offense level of 34, based on the quantity of drugs involved. The PSR further recommended a two-level enhancement for Guzman-Tlaseca's possession of a firearm, and a two-level enhancement for his managerial role in the drug conspiracy. The district court rejected the enhancement for possession of a firearm, but found Guzman-Tlaseca to be a manager and enhanced his offense level to 36, with a category III criminal history. This resulted in a guideline range of imprisonment of 235 to 293 months. The district court imposed a 264-month sentence.

## II.

Guzman-Tlaseca appeals the denial of his motion to suppress the evidence on the grounds that none of the three warrants were supported by probable cause. We review a district court's factual conclusions for clear error and its legal conclusions *de novo*. United States v. Nguyen, 526 F.3d 1129, 1133 (8th Cir. 2008). We conclude that the district court properly denied Guzman-Tlaseca's motion to suppress.

"Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." United States v. Nolen, 536 F.3d 834, 839 (8th Cir. 2008) (quoting United States v. Fladten, 230 F.3d 1083, 1085 (8th Cir. 2000)). As the Supreme Court has emphasized, probable cause is a "practical, nontechnical conception." Illinois v. Gates, 462 U.S. 213, 231 (quoting Brinegar v. United States, 338 U.S. 160, 176 (1949)). It deals with probabilities that are not "technical" but "are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Id. (quoting Brinegar, 338 U.S. at 175).

Regarding the document search warrant for the 55th Street residence, the district court properly found that the totality of the circumstances established probable cause. Guzman-Tlaseca contends that the warrant was unsupported by probable cause

because the handwritten notation concerning "drug ledgers" did not indicate the basis of the CRI's knowledge. However, "an informant's basis of knowledge [is] an important consideration, but not a rigid requirement, in the probable cause determination." United States v. Anderson, 933 F.2d 612, 615 (8th Cir. 1991) (citing Gates, 462 U.S. at 230). Other indicia of reliability, such as past reliable cooperation with law enforcement, can compensate for a deficiency in the basis of knowledge. See Gates, 462 U.S. at 233.

The district court found that the CRI that informed about the drug ledgers was the same person identified as CRI-1 elsewhere in the affidavit. The affidavit stated that CRI-1 had informed law enforcement that Guzman-Tlaseca was distributing methamphetamine from the Richfield residence. Two other informants corroborated this. Furthermore, CRI-1 had previously provided the names and telephone numbers of individuals involved in the distribution of narcotics, which were independently corroborated and led to seizures of narcotics. This was sufficient to show "a fair probability that contraband or evidence of a crime" would be found at the 55th Street residence. See United States v. Robinson, 536 F.3d 874, 877 (8th Cir. 2008) (holding that probable cause existed where confidential informant told police about narcotics trafficking at defendant's residence and conducted controlled buy of cocaine from defendant) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).

Likewise, the second warrant to search the 55th Street residence was supported by probable cause. While executing the first warrant, two officers found a white, powdery substance wrapped in folded currency that field tested positive for methamphetamine. Additionally, law enforcement found other items associated with narcotics trafficking, including opened heat-sealed bags, ziplock bags, and a white powder commonly used to increase the volume of methamphetamine for sale. This was more than sufficient to show a fair probability that contraband or evidence of a crime would be found. See, e.g., Robinson, 536 F.3d at 877; Gates, 462 U.S. at 238.

As for the warrant to search the Richfield residence, three informants (CS-1, CRI-1, and CI-1) indicated that Guzman-Tlaseca distributed methamphetamine from the house. Both CS-1 and CRI-1 previously provided reliable, independently corroborated information to law enforcement. CS-1 and CI-1 conducted controlled buys of methamphetamine from Guzman-Tlaseca. Co-defendant Placensia identified the Richfield residence as a "stash house" used by her supplier, Reyner Diaz Figueroa. She also identified Guzman-Tlaseca in a photographic array as someone she had seen at the Richfield residence giving money to Diaz Figueroa. This information was sufficient to show a fair probability that narcotics could be found at the Richfield residence.[4] See Robinson, 536 F.3d at 877; Gates, 462 U.S. at 238.

## III.

Guzman-Tlaseca also appeals the jury's guilty verdict on the grounds that it was not supported by sufficient evidence. However, he does not argue that the government provided insufficient evidence to support the three elements of conspiracy. See, e.g., United States v. Adams, 401 F.3d 886, 893 (8th Cir. 2005) (to convict on a charge of conspiracy, "the government must prove beyond a reasonable doubt that there was an agreement to achieve some illegal purpose, that the defendant knew of the agreement, and that the defendant knowingly became a part of the conspiracy") (quotation omitted). Instead, he argues that the government charged him with conspiring with others to distribute methamphetamine from July 2005 until January 2007, but offered no evidence of his involvement in drug trafficking after May 2006. Put another way, he argues that the evidence was insufficient because the government alleged that the conspiracy continued for 18 months, but only submitted evidence of his involvement

---

[4]Guzman-Tlaseca also argues that the good faith exception to the exclusionary rule should not apply, because the search warrant applications were so deficient that no reasonable police officer could believe that the searches were legal. See United States v. Leon, 468 U.S. 897, 923 (1984). Given that the applications supplied probable cause, this argument fails as well.

for the first 10 months of that period. He cites no authority for this proposition, and discusses it only briefly.

As an initial matter, we note that "[i]t is not this court's job to research the law to support an appellant's argument." United States v. Stuckey, 220 F.3d 976, 981 (8th Cir. 2000) (quoting Lusby v. Union Pac. R.R. Co., 4 F.3d 639, 642 (8th Cir. 1993)). Secondly, "the government was not required to prove that [Guzman-Tlaseca] was involved in a conspiracy that filled the entire period charged." United States v. Baker, 367 F.3d 790, 799 (8th Cir. 2004) (citation omitted); see also United States v. Harris, 344 F.3d 803, 805 (8th Cir. 2003) (per curiam) ("[A] variance between the date set forth in the indictment and the proof at trial is not fatal as long as the acts alleged were committed within the statute of limitations and before the date of the indictment.") (citing Stuckey, 220 F.3d at 982); United States v. Davis, 679 F.2d 845, 852 (11th Cir. 1982) ("Neither is time an essential element [of conspiracy] so long as the time frame proved was within the period alleged in the indictment.").

When reviewing a jury verdict for sufficiency of evidence, "we look at the evidence in the light most favorable to the verdict and accept as established all reasonable inferences supporting the verdict." Adams, 401 F.3d at 893 (quotation omitted). "We will reverse only if we conclude that a reasonable fact-finder must have entertained a reasonable doubt about the government's proof of one of the offense's essential elements." Id. (internal quotation omitted).

To convict Guzman-Tlaseca of conspiracy, the government must prove beyond a reasonable doubt that he entered an agreement with others to distribute narcotics, that he knew of the agreement, and that he knowingly became a part of the conspiracy. See, e.g., id. "A formal agreement is not required to create a conspiracy, and the existence of a conspiracy can be proved by direct or circumstantial evidence." United States v. Williams, 534 F.3d 980, 985 (8th Cir. 2008). "Notably, '[a] defendant challenging the sufficiency of the evidence in a conspiracy case has a heavy burden.'"

United States v. Nolen, 536 F.3d 834, 842 (8th Cir. 2008) (quoting United States v. Mickelson, 378 F.3d 810, 821 (8th Cir. 2004)).

The government presented ample evidence of Guzman-Tlaseca's participation in a drug trafficking conspiracy. Co-defendant Sifuentes testified that he collected money and delivered drugs for Guzman-Tlaseca. Sifuentes also testified that co-defendant Garciduenos replaced him in this capacity. Scott Groff testified that Guzman-Tlaseca supplied him with narcotics to sell. Guzman-Tlaseca sold significant quantities of methamphetamine to informants and law enforcement in April and May 2006. On January 14, 2007, police stopped a vehicle in which Guzman-Tlaseca was riding and found small amounts of methamphetamine and $2,200 in mostly twenty-dollar bills on his person. In January 2007, law enforcement executed warrants on two residences used by Guzman-Tlaseca and discovered methamphetamine and other indicia of drug trafficking, including a pistol, ammunition, and documents belonging to co-defendant Sifuentes.

Viewing this evidence in a light most favorable to the verdict, we conclude that the evidence was sufficient to support the jury's finding that Guzman-Tlaseca was guilty of conspiring to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(A), and 846. See, e.g., United States v. Hogan, 539 F.3d 916, 924-25 (8th Cir. 2008) (evidence of narcotics conspiracy sufficient where defendant obtained methamphetamine from suppliers, provided it to other dealers, and received payment in return); Nolen, 536 F.3d at 842-43 (testimony of a circumstantial nature was sufficient even where no evidence of explicit agreement to engage in narcotics trafficking was introduced); Williams, 534 F.3d at 985-86 (evidence of conspiracy sufficient where defendant identified two of his sources that sent him cocaine over prior 18 months, and a search of defendant's car uncovered quantities greater than amount for personal use).

IV.

Guzman-Tlaseca challenges the imposition of a 20-year mandatory minimum sentence as a result of his prior drug conviction in Utah. We review the district court's application of §841(b) *de novo*. United States v. Davis, 417 F.3d 909, 913 (8th Cir. 2005), cert. denied 546 U.S. 1144 (2006).

On January 24, 2006, Guzman-Tlaseca pled guilty in Utah to illegal possession of a controlled substance, third degree. He received a five-year suspended sentence. He now argues that his prior conviction is not a "felony drug offense" for purposes of 21 U.S.C. § 841(b)(1). For purposes of § 841(b)(1), "felony drug offense" is defined as "an offense that is punishable by imprisonment for more than one year under any law of the United States or of a State. . ." 21 U.S.C. § 802(44). Guzman-Tlaseca's argument rests on the fact that the Utah statute in question imposes an "indeterminate" sentence "[i]n the case of a felony of the third degree . . . for a term not to exceed five years." Utah Code Ann. § 76-3-203(3). Thus, he asserts that his prior conviction was not a "felony drug offense" under federal law because a third degree felony conviction in Utah might result in less than a one-year sentence.

We reject this argument. Federal law defines "felony drug offense" as one "punishable by imprisonment for more than one year . . ." 21 U.S.C. § 802(44). As the Ninth Circuit has held, "in determining whether a state conviction is punishable for more than one year's imprisonment for purposes of a federal criminal statute predicated on a prior felony conviction or for federal sentencing purposes, we look to the maximum penalty allowed by [the state] statute." United States v. Murillo, 422 F.3d 1152, 1153-54 (9th Cir. 2005), cert. denied 547 U.S. 1119 (2006). Third degree possession of a controlled substance in Utah may result in a maximum five-year sentence. Utah Code Ann. § 76-3-203(3). Thus, the offense is punishable by imprisonment for more than one year. Accordingly, the district court properly determined that Guzman-Tlaseca had a prior felony drug conviction requiring the

-11-

imposition of a mandatory minimum 20-year sentence under 21 U.S.C. § 841(b)(1)(A)(viii).

## V.

Guzman-Tlaseca also challenges his sentence asserting that the district court erred by enhancing his base offense level by two levels for his managerial role in the offense. See United States Sentencing Commission, Guidelines Manual, §3B1.1(c) (Nov. 2007). "We review the district court's decision to assess a sentencing enhancement based upon a defendant's role in the offense for clear error . . ." United States v. Johnson, 278 F.3d 749, 752 (8th Cir. 2002). We construe the term "manager" broadly under U.S.S.G. §3B 1.1. See United States v. Rosas, 486 F.3d 374, 376 (8th Cir. 2007); United States v. Erhart, 415 F.3d 965, 973 (8th Cir. 2005), cert. denied 546 U.S. 1156 (2006). When determining whether a defendant played a managerial role in an offense, application note four to section 3B1.1 directs the sentencing court to consider such factors as:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

Co-defendant Sifuentes testified that Guzman-Tlaseca approached him while he was performing work on Guzman-Tlaseca's residence and offered him employment in his drug trafficking ring. Sifuentes testified that he began collecting money and delivering drugs for Guzman-Tlaseca, that Guzman-Tlaseca gave him a phone to use for drug related business, and that Guzman-Tlaseca changed the number frequently. Furthermore, informant Groff testified that when he arranged to buy methamphetamine from Guzman-Tlaseca, Sifuentes arrived to conduct the transaction.

When Groff did not have enough money to pay both an existing debt and buy the methamphetamine, Sifuentes called Guzman-Tlaseca to receive instructions.

Based upon this evidence, we conclude that the district court's finding that Guzman-Tlaseca was a manager was not clearly erroneous. See, e.g., Rosas, 486 F.3d at 376 (affirming a finding that defendant was a manager where he hired others to travel to California to acquire methamphetamine, supplied the money used to purchase drugs, and hired others to package drugs); United States v. Plancarte-Vazquez, 450 F.3d 848, 853-54 (8th Cir. 2006) (to be a manager "it is enough if the defendant assumed organizing or leadership functions such as recruiting others, determining the price or location of sales, and so forth") (quotation omitted); United States v. Zimmer, 299 F.3d 710, 723-24 (8th Cir. 2002) (defendant was a manager of a drug conspiracy where he provided instruction to others on how to manufacture methamphetamine).

VI.

The judgment is affirmed.

_____