# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-3928

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Plaintiff–Appellee, | * |
| | * |
| v. | * |
| | * |
| Damien M. Foxx, | * |
| | * |
| Defendant–Appellant. | * |

_____

No. 08-1009

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Plaintiff–Appellee, | * |
| | * |
| v. | * |
| | * |
| Willie M. Foxx, | * |
| | * |
| Defendant–Appellant. | * |

On Appeal from the United States
District Court for the Western
District of Missouri.

_____

No. 08-1010

_____

United States of America,          *
                                        *

        Plaintiff–Appellee,      *
                                        *

     v.                         *
                                        *

Danny E. Osborne,            *
                                        *

        Defendant–Appellant.   *

_____

Submitted:  June 11, 2008
Filed:  October 22, 2008

_____

Before MELLOY, ARNOLD, and BENTON, Circuit Judges.

_____

MELLOY, Circuit Judge.

This case involved a conspiracy to distribute large quantities of marijuana in and around Springfield, Missouri.  A jury found Damien M. Foxx, Willie M. Foxx, and Danny E. Osborne guilty of conspiracy to distribute 1,000 kilograms or more of marijuana, a violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. Additionally, Damien Foxx was found guilty of money laundering and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956, and Damien Foxx and Willie Foxx were found to have conspired to purchase property with the proceeds of unlawful activity and subject to criminal forfeiture under 21 U.S.C. § 853.  Damien Foxx was sentenced to 210 months' imprisonment.  See 21 U.S.C. § 841(b)(1)(A).  Willie Foxx and

Osborne were sentenced to the statutory mandatory minimum sentence of 120 months' imprisonment. The defendants appeal their convictions and sentences.

The evidence implicating Damien Foxx in the conspiracy to distribute 1,000 or more kilograms of marijuana is overwhelming. Although Willie Foxx and Osborne played lesser roles in the conspiracy, the evidence clearly implicates them and provides a basis for a reasonable jury to conclude Willie Foxx and Osborne could have reasonably foreseen that the conspiracy involved 1,000 kilograms or more of marijuana. We affirm.

I.     Background

We present the facts in the light most favorable to the jury's verdict. United States v. Montano, 506 F.3d 1128, 1132 (8th Cir. 2007). Lewis Lamonte Smith and Billy Berringer supplied marijuana to Damien Foxx. Evidence at trial included testimony from Smith and Berringer—who testified pursuant to plea agreements—recordings of telephone conversations intercepted from Damien Foxx's telephone, and testimony from investigating officers.

Smith testified he met Damien Foxx in 2000. Smith and Anthony Gilmore had been supplying marijuana to a marijuana dealer who supplied it to Damien Foxx. In 2001, Gilmore left Springfield and Smith contacted Damien Foxx, among others, and offered to sell him marijuana directly. Damien Foxx agreed. Starting in 2001, Smith brought marijuana from Kansas City, where he lived, to Damien Foxx in Springfield. Smith testified Willie Foxx was present "once or twice." Smith started by delivering 50 to 100 pounds of marijuana to Damien Foxx every two-and-a-half to three weeks. This increased to 150 to 200 pounds of marijuana every three weeks by October 2003, and beginning in 2004, Smith was bringing at least 450 to 500 pounds per month to Damien Foxx and another customer, although Damien Foxx received the majority of the marijuana delivered. This continued until Smith was arrested in June 2004 while

on his way to deliver 139.5 kilograms of marijuana to Damien Foxx. In addition, officers seized $987,000 from Smith, which he received from selling marijuana to Damien Foxx and smaller dealers in the Springfield area. According to Smith's testimony as to the cost per pound of marijuana, $987,000 was likely earned from selling 1,316 to 1,410 pounds (596.1 to 638.7 kilograms) of marijuana. Based on this testimony, a reasonable jury could conclude Smith delivered at least 2,350 pounds (1053.2 kilograms) to Damien Foxx between October 2003 and June 2004.

After Smith was arrested, Damien Foxx purchased marijuana from Berringer, to whom Damien Foxx had previously sold marijuana. (Berringer had purchased a total of 400 pounds of marijuana from Damien Foxx between October 2003 and June 2004.) Berringer testified he and his girlfriend would deliver marijuana to Damien Foxx at 418 Evergreen, George Dye's residence, which was used for drug transactions. Dye—the Foxxes' cousin—and Willie Foxx were sometimes present. Berringer admitted to making a 50-pound delivery of marijuana on December 10, 2004, a 20-pound delivery on December 14, a 60-pound delivery on December 23, a 55-pound delivery on January 12, 2005, a 60-pound delivery on January 14, a 100-pound delivery on January 17, and a 142-pound delivery on January 24. During December 2004 and January 2005, Berringer delivered 487 pounds (approximately 220 kilograms) of marijuana to Damien Foxx, and between June 2004 and January 2005, Berringer delivered at least 1,000 pounds (approximately 455 kilograms) of marijuana to him.

In November 2004, law enforcement obtained court permission to monitor Damien Foxx's telephone conversations. Sixty of these conversations between Damien Foxx and Willie Foxx, Danny Osborne, and others were played at trial. Many of these conversations, which took place between December 3, 2004, and January 30, 2005, indicated Damien Foxx was involved in marijuana transactions. Damien Foxx said in a telephone call to Ryan Dill, another person involved in marijuana transactions, that he had to "weigh this shit out" and wanted "Ben" to bring the scale.

Later, Damien Foxx called Ben Christian asking for the scale. In another conversation, Damien Foxx called Willie Foxx and said Damien Foxx was "over at G's house" and was going to "[w]eigh it all out." "G" is George Dye.

Damien Foxx talked with Berringer and complained that the marijuana in the latest delivery was dry, unlike the previous delivery. Berringer explained the marijuana was dry because his "guy said he bought like a ton." Damien Foxx told Berringer that Damien Foxx would pay him by noon.

In another conversation, Damien Foxx called Willie Foxx asking whether "anybody complain[ed] about theirs" and whether "it smoke[d] good." Willie Foxx laughed and said "that shit ain't no, ain't really no good." Willie Foxx indicated customers would "buy[] up the dro before they buy that." "Dro" is slang for higher quality marijuana or hydroponic marijuana, according to an officer who testified at trial.

In other conversations, Willie Foxx contacted Damien Foxx asking for more marijuana. Other conversations include Damien Foxx taking clients' orders and discussing what Damien Foxx gave to clients and how business would be slower because one of his "guys" got arrested. Damien Foxx also placed orders with Berringer and discussed quantities of marijuana ordered and how much orders would cost. In one conversation, Damien Foxx told Berringer he would "probably have like 60 for [Berringer]." Berringer testified at trial that this referred to the $60,000 Damien Foxx would pay him for marijuana.

On December 22, Damien Foxx and Billy Berringer talked on the phone, and Berringer told Damien Foxx how much marijuana Berringer had for Damien Foxx. Damien Foxx replied that that amount would work and that he had sold most of it already. Berringer said his "guy should be back first thing Friday morning." The next day, Berringer called Damien Foxx and said he was "trying to get rid of this stuff."

They agreed to meet "at that usual house" in 20–25 minutes. Law enforcement later observed a green Cadillac Escalade belonging to Berringer and a Chevrolet Blazer driven by Berringer's girlfriend arrive at 418 Evergreen. Damien Foxx and Berringer met at the rear of the Blazer and removed boxes from the Blazer and put them in the back of Foxx's white Escalade, which was in front of the house.

Officers observed a similar transaction at 418 Evergreen between Berringer and his girlfriend and Damien Foxx on December 26. Willie Foxx was also present. After this transaction, law enforcement intercepted a call between Damien Foxx and Dill where Damien Foxx said he had "just picked it up," and Dill responded he would "be there in about ten minutes." Later, a vehicle arrived at 418 Evergreen, and Foxx removed a box he had received from Berringer and put it inside the vehicle.

Also on December 26, Lameeka Jeffries, Damien Foxx's girlfriend and Danny Osborne's niece, told Damien Foxx that Osborne needed to talk with him. Osborne and Damien Foxx talked on the phone and Osborne asked to meet Damien Foxx "face to face" because he did not want to discuss the issue on the phone. They agreed to meet later.

Later that day, Damien Foxx referenced this meeting with Osborne. Damien Foxx told Berringer that Osborne's previous marijuana supplier had been arrested, so Osborne would be purchasing marijuana from Damien Foxx. As a result, Damien Foxx told Berringer he wanted 100 to 150 more pounds of marijuana per month. Damien Foxx referenced Illinois and indicated the customers would "pay all cash." Berringer told Damien Foxx he could not supply more, but that he would work on it. On January 12, a Wednesday, Berringer told Damien Foxx he was bringing "55," but that more would arrive on Friday. On Friday, Berringer said that he had another 50 but could "get ten more from this other guy." Damien Foxx said that would not help to supply Osborne because Damien Foxx wanted to "keep [his] regulars happy" and "tak[e] care of the people around here first." Damien Foxx tried to get enough

marijuana to supply Osborne and told Osborne he was having difficulties. Later, Damien Foxx contacted Osborne to tell him "it ain't come through like [he] thought it was" but that he would probably pick it up Monday or Tuesday morning. Finally, Osborne told Damien Foxx he would come to pick up the marijuana. Although he could send someone else, Osborne told Damien Foxx he would "rather be in the car" to avoid "side deals." Osborne brought the marijuana to Illinois.

During the investigation, law enforcement officers conducted surveillance. Damien Foxx was aware he was being investigated, and in telephone conversations he described the undercover police vehicle that was conducting surveillance and told various individuals to "clean." Damien Foxx told Jeffries to "go to the house and . . . get all the . . . good" and put it in her trunk. "Good" is slang for marijuana, as an officer testified at trial. Damien Foxx then asked her to "meet [him] at the house" after she "clean[ed] up all the dishes" and "the area" and to "clean . . . up" "any dirty spots." He told her to "wipe everything down . . . or whatever you think that needs to be taken out to the house," and he would "take it out." After calling others involved in the marijuana conspiracy, Damien Foxx called another brother, David Foxx, and told him to "clean [his] house up" by "get[ting] anything that's not supposed to be there out" and to "clean it like you don't want to go where you don't want to go clean it." Later, Damien Foxx again called David Foxx and asked if he was getting his house clean. David Foxx replied that "[t]he living room looks better" and that he was "ready to go work on [the] dishes." Damien Foxx replied that he "didn't mean like that clean" but that "you know that stuff that can send you to jail." Damien Foxx also called Willie Foxx and told him not to meet at the ususal spot because "something funny's goin' on." Damien Foxx told Willie Foxx that a truck was following him. Willie Foxx asked if it was "the boys," and Damien Foxx said "[i]t might have been them boys."

On January 30, law enforcement officers, pursuant to search warrants, searched the residences of Damien Foxx and Berringer, as well as other locations associated

with Damien Foxx's drug activity. At Damien Foxx's residence, officers discovered $50,355, an Escalade officers had observed Damien Foxx using to pick up marijuana, and another car. Officers also discovered property receipts for 418 Evergreen, car title to the Escalade, bank records indicating Damien Foxx had a balance of $19,441.97, and receipts for large cash purchases. At 418 Evergreen, officers discovered firearms, marijuana, drug scales, and $4,085.

Following the searches, Damien Foxx had numerous telephone conversations. Willie Foxx and Damien Foxx discussed what the officers did and did not find. Willie Foxx suggested to Damien Foxx he could explain the large amounts of cash by saying he had just sold a car. They also discussed other members of the conspiracy and what officers had found at their homes, specifically, that officers found a firearm at 418 Evergreen. Willie Foxx and Damien Foxx discussed whether Dye's mother would claim the firearm as her own. Willie Foxx told Damien Foxx that law enforcement "hit [him] when the time was good" and that he "got lucky." Damien Foxx agreed and said he was glad he did not have "all [his] change out here." Willie Foxx asked whether it was somewhere else. Willie Foxx expressed concern officers would investigate him.

Damien Foxx also talked with Osborne, who asked if anyone Damien Foxx knew got "popped recently." Damien Foxx told Osborne "they didn't find no bags, no scales, no nothing," but that he was going to "get[] a great lawyer" because he was "spooked." Osborne told Damien Foxx to "[g]et rid of everything [he] can move and hide" because the officers were "building something against you, against you all." Osborne said Damien Foxx had a "rat somewhere down there" who "[knew] everything and every . . . body." Later, Osborne told Damien Foxx not to talk with anyone on the phone and to buy disposable phones. Following this conversation, the volume of the telephone conversations intercepted from Damien Foxx's telephone number decreased.

Officers also investigated Damien Foxx's financial activities. At the time of the investigation, Damien Foxx was in the process of purchasing 418 Evergreen. In 2003 Damien Foxx made $117,998.23 in personal and real estate purchases. In 2004 he made $139,452.80 in purchases, and in the first month of 2005 he made $21,146.80 in purchases. According to his tax records, Damien Foxx had no income for 2002 and 2004 and $9,182.00 of income in 2003. Berringer testified he did not observe that Damien Foxx was employed. Additionally, Damien Foxx owned two expensive vehicles. Willie Foxx, who was in frequent contact with his brother Damien, was aware of Damien Foxx's vehicles.

Neither Damien Foxx nor Willie Foxx testified at trial. Osborne testified and stated he did not pick up marijuana from Damien Foxx. Osborne explained the telephone conversations were in reference to shoes he purchased from Damien Foxx and sold at double the price. When Osborne asked Damien Foxx whether it was the good kind, Osborne was not inquiring as to marijuana, but as to whether the shoes were in actual Nike boxes or whether they were tied together by laces. Osborne testified he did not transport drugs to Illinois, but that he was picking up his niece and dropping off cooking oil for his dad. Osborne said he told Damien Foxx to get rid of his cars because Osborne wanted to purchase them from Damien Foxx for a cheap price. Osborne told Damien Foxx he had a "rat" in order to convince him to get rid of his things so Osborne could purchase them. Osborne testified he did not know why he told Damien Foxx to buy disposable phones.

II.    Discussion

"We review de novo the sufficiency of the evidence to sustain a conviction, examining the evidence in the light most favorable to the jury verdict and giving the verdict the benefit of all reasonable inferences. We will reverse the jury verdict only if no reasonable jury could have found [the defendants] guilty." Montano, 506 F.3d at 1132 (citation omitted). "The standard of review of an appeal concerning the

sufficiency of the evidence is very strict, and the verdict of the jury should not be overturned lightly." United States v. Scott, 64 F.3d 377, 380 (8th Cir. 1995) (quotation and citation omitted).

A.     Damien Foxx

Damien Foxx first argues that the evidence is insufficient to support his conviction for conspiracy to distribute 1,000 kilograms or more of marijuana because a reasonable jury could not have concluded the conspiracy involved that much marijuana. Damien Foxx's argument is based on challenges to Smith's and Berringer's credibility. Damien Foxx asserts they cannot be trusted because they testified pursuant to a plea agreement. Credibility determinations, however, are well within the province of the jury. United States v. Baker, 367 F.3d 790, 798 (8th Cir. 2004). "The fact that these witnesses testified in exchange for the possibility of reduced sentences does not categorically make their testimony infirm or require that their testimony be corroborated in order to support a conviction." Id. The district court instructed the jury it could "give the testimony of each witness such weight as [it thought the testimony] deserved. Whether or not testimony of a witness may have been influenced by their hope of receiving a reduced sentence is for [the] jury to decide." Damien Foxx also asserts that witnesses did not see him with a quantifiable amount of marijuana and that "it seems that the Government was double dipping on the weights" by presenting evidence from co-conspirators and Berringer. Damien Foxx does not elaborate on this argument or specify what evidence was allegedly counted twice.

Considering the amount of marijuana Smith and Berringer delivered to Damien Foxx, we find the evidence is sufficient to support Damien Foxx's conviction for conspiracy to distribute 1,000 kilograms or more of marijuana. See United States v. Buckley, 525 F.3d 629, 633 (8th Cir. 2008) (finding sufficient evidence to support a drug conviction where "numerous witnesses testified to [the defendant's] ongoing

sales of distribution quantities of crack cocaine," which was "supported by tapes of [the defendant] arranging drug deals," among other supporting evidence).

Second, Damien Foxx argues that the evidence is insufficient to support his conviction for conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(h) because no evidence indicated his financial transactions were the result of unlawful activity. This argument also fails because the government presented evidence sufficient to enable a reasonable jury to conclude Damien Foxx "engaged in financial transactions with the knowing use of the proceeds of illegal activities and with the intent to promote the carrying on of unlawful activity." United States v. Hudspeth, 525 F.3d 667, 677 (8th Cir. 2008) (quotation omitted). Foxx, who had no discernible source of income other than selling marijuana, paid large amounts of money to Smith and Berringer to purchase marijuana. The evidence is thus sufficient to support Damien Foxx's conviction for money laundering. See United States v. Evans, 272 F.3d 1069, 1082–83 (8th Cir. 2001) (finding witness testimony that money was earned from illegal activities and used to further illegal activities sufficient evidence to support a money-laundering conviction).

Similarly, Damien Foxx argues insufficient evidence supports his criminal forfeiture because no evidence indicated two or more people conspired to purchase 418 Evergreen with the proceeds of unlawful activity. Evidence indicates Damien Foxx spent approximately $49,000 obtained from selling marijuana to purchase 418 Evergreen. We therefore reject this argument.

B.    Willie Foxx

Willie Foxx argues the evidence is insufficient to support his conviction because no evidence indicates he could have reasonably foreseen 1,000 kilograms or more of marijuana was involved in the conspiracy. The jury was instructed that each

defendant was responsible for the quantity they themselves possessed, distributed, or agreed to distribute, and also for the quantity fellow conspirators distributed or agreed to distribute if those distributions or agreements "were a necessary or natural consequence of the agreement or understanding and were reasonably foreseeable by the defendant." The jury found beyond a reasonable doubt that Willie Foxx was responsible for 1,000 kilograms or more of marijuana.

As a defendant in a conspiracy, Willie Foxx can be convicted of a conspiracy based on "all reasonably foreseeable drug quantities that were in the scope of the criminal activity that he jointly undertook." United States v. Littrell, 439 F.3d 875, 881 (8th Cir. 2006) (quotation omitted). Willie Foxx paid Berringer $8,000 for marijuana Berringer delivered to Damien Foxx. As indicated above, Willie Foxx participated in conversations involving drug transactions and he and Damien Foxx discussed the extent of the conspiracy. Willie Foxx's continuous contact with Damien Foxx regarding marijuana transactions and Willie Foxx's involvement with the transactions provides sufficient evidence he met the 1,000-kilogram threshold. Id. at 880–81; see also United States v. Lopez, 414 F.3d 954, 959 n.3 (8th Cir. 2005) (rejecting a defendant's argument that his conviction for conspiracy to distribute more than 500 grams of methamphetamine could not stand when he claimed he personally handled less than 500 grams of methamphetamine because the defendant's co-conspirator possessed and delivered more than 500 grams of methamphetamine). We find the extent of Willie Foxx's involvement in the conspiracy provides evidence sufficient to support his conviction for conspiracy to distribute 1,000 kilograms or more of marijuana.

Willie Foxx relies on this court's decision in United States v. Rolon-Ramos, 502 F.3d 750 (8th Cir. 2007). In Rolon-Ramos, the jury found the defendant guilty of conspiracy to distribute at least 500 grams of methamphetamine, but we determined that the evidence was "wholly insufficient to connect [the defendant] to a conspiracy to distribute 500 grams or more of methamphetamine." Id. at 754–55. While the

defendant in <u>Rolon-Ramos</u> was present in a motel room when a drug transaction took place and during a conversation regarding unpaid drug debt, this evidence was insufficient because there was no indication that drug quantities or debt amounts were discussed in this conversation. <u>Id.</u> at 755. Furthermore, there was no evidence that the defendant in <u>Rolon-Ramos</u> spoke or understood English, the language used in the conversation. <u>Id.</u> Unlike the evidence against the defendant in <u>Rolon-Ramos</u>, the evidence here could enable a reasonable jury to conclude Willie Foxx could have reasonably foreseen the extent of the conspiracy. Willie Foxx participated in telephone conversations with Damien Foxx beginning shortly after officers began monitoring the conversations. These conversations indicated Willie Foxx knew Damien Foxx was engaged in marijuana transactions with numerous individuals and that he was generating a substantial amount of income. Therefore, contrary to the evidence in <u>Rolon-Ramos,</u> the evidence is sufficient to support Willie Foxx's conviction.

### C.    Danny Osborne

Danny Osborne argues that the evidence is insufficient to support his conviction for conspiracy to distribute 1,000 kilograms or more of marijuana because the evidence does not indicate he was involved in the conspiracy or that he could have foreseen the quantity of marijuana involved in the conspiracy.

Osborne asserts he neither knew of nor intentionally joined the conspiracy. The evidence, however, indicates otherwise. On December 26, Osborne told his niece, Lameeka Jeffries, he wanted to see Damien Foxx in person to discuss something. That same day, Damien Foxx talked with Berringer saying Osborne was a new customer and indicating Damien Foxx needed an additional 100 to 150 pounds of marijuana per month. Osborne and Damien Foxx discussed marijuana that did not come through and that Osborne still wanted more. Damien Foxx and Osborne also discussed recent arrests of co-conspirators. Osborne had conversations with Damien

-13-

Foxx that could lead a reasonable jury to conclude Osborne purchased marijuana from Damien Foxx and delivered it to Illinois. While Osborne explained that these conversations involved the sale of shoes, we find that a reasonable jury could doubt Osborne's credibility. See United States v. Maggard, 156 F.3d 843, 847 (8th Cir. 1998) (noting credibility determinations are within the province of the jury). Taking this evidence in the light most favorable to the jury's verdict, we conclude the evidence is sufficient to sustain Osborne's conviction for conspiracy to distribute marijuana. See Scott, 64 F.3d at 380 ("Once the existence of a conspiracy has been established, even slight evidence connecting a particular defendant to the conspiracy may constitute proof of the defendant's involvement in the scheme to render the defendant culpable." (quotation and alteration omitted)); United States v. Hoelscher, 914 F.2d 1527, 1534 (8th Cir. 1990) ("Once a person joins a conspiracy . . . he assumes full liability for the conspiracy even though he joined in the later stages.").

Osborne, like Willie Foxx, cites Rolon-Ramos and argues there is insufficient evidence to enable a reasonable jury to conclude Osborne could have reasonably foreseen the amount of marijuana in the conspiracy. However, we find the evidence is sufficient for a reasonable jury to conclude Osborne could have reasonably foreseen that the conspiracy involved 1,000 kilograms or more of marijuana. See Pinkerton v. United States, 328 U.S. 640, 647 (1946) (noting that in the law of conspiracy, the act of one partner in crime is attributable to everyone in the conspiracy). The evidence in the light most favorable to the verdict indicates Osborne contacted Damien Foxx to purchase 150 pounds of marijuana per month on an ongoing basis and transported marijuana from Missouri to Illinois. This indicates Osborne knew Damien Foxx was a significant dealer who had the ability to supply 100-pound plus quantities on a regular basis. Damien Foxx told Osborne that Damien Foxx was the only person who knew everyone involved in the conspiracy, thus communicating to Osborne there was a conspiracy of a greater extent than Osborne's direct involvement. Osborne told Damien Foxx that he had a "rat" and advised Damien Foxx to get rid of his vehicles, to hide, and to buy disposable telephones. The evidence indicates that Osborne not

only knew the conspiracy was extensive enough that he could reasonably foresee it involved 1,000 kilograms or more of marijuana, but also that he had a level of commitment to and involvement in the conspiracy beyond that of a mere end user or one-time seller. Because Osborne's involvement in and knowledge of the conspiracy were far greater than the defendant's involvement in <u>Rolon-Ramos</u>, we disagree with Osborne's assertion that <u>Rolon-Ramos</u> supports reversal of his sentence. See <u>Rolon-Ramos</u>, 502 F.3d at 754–55.

The government concedes Osborne was not involved in the conspiracy before December 26, 2004. To be responsible for drug quantities of co-conspirators, however, Osborne need not have been a member of the conspiracy at the time the earlier drug quantities were distributed if those prior quantities were known or reasonably foreseeable to him. See <u>United States v. Jones</u>, 965 F.2d 1507, 1517 (8th Cir. 1992) ("[I]f a defendant agrees to aid a large-volume drug dealer in completing a single, small sale of drugs, the defendant will not be liable for *prior or subsequent acts* of the dealer *that were not reasonably foreseeable*." (emphasis added)); <u>see also</u> <u>United States v. Ellerman</u>, 411 F.3d 941, 948 (8th Cir. 2005) ("By joining the conspiracy, [the defendant, for purposes of determining career offender status,] participated in, and is liable for, *all prior co-conspirators' actions* that furthered the conspiracy." (emphasis added)).

For § 841(b) purposes, a defendant may be held responsible for any drugs "possessed and sold by [his co-conspirators] if their activities were (1) in furtherance of the conspiracy and (2) were either known to [the defendant] or were reasonably foreseeable to [the defendant]." <u>Id</u>. When a defendant joins a conspiracy in its later stages, the "concept of foreseeability (a forward looking concept) must be turned around 180 degrees and be applied to the conduct of co-conspirators occurring before the entry of [that] particular defendant." <u>United States v. Edwards</u>, 945 F.2d 1387, 1393 (7th Cir. 1991); <u>see also</u> <u>United States v. Martinez</u>, 987 F.2d 920, 924, 926 (2d Cir. 1993) (relying on <u>Jones</u> in holding that a late-joining member of a conspiracy

-15-

cannot be responsible for earlier quantities "unless a preponderance of the evidence shows that [the defendant] knew or reasonably should have known about the quantities . . . that [the co-conspirator] had sold."). The evidence of Osborne's participation in and knowledge of the conspiracy could lead a reasonable jury to conclude that Osborne could have reasonably foreseen the quantities involved in the conspiracy, notwithstanding the fact that he was not a member of the conspiracy at the time the majority of those quantities were distributed.

We note that this rule does not currently apply when determining quantity for relevant-conduct purposes under the U. S. Sentencing Guidelines Manual, which now provides that "[a] defendant's relevant conduct does not include the conduct of members of a conspiracy prior to the defendant joining the conspiracy, even if the defendant knows of that conduct." USSG § 1B1.3 cmt. (n.2). In Jones, we considered the scope of responsibility for both the Sentencing Guidelines and § 841(b), stating that "[t]he same standards govern the district court's drug quantity determination for section 841(b) and the Sentencing Guidelines." Jones 965 F.2d at 1517 (citing United States v. Johnson, 944 F.2d 396, 405 (8th Cir.), cert. denied, 502 U.S. 1008 (1991)). Our sister circuits have similarly held that the standards that apply to the Sentencing Guidelines in these circumstances also apply to § 841(b). United States v. Madkins, 14 F.3d 277, 279 (5th Cir. 1994) ( "[o]ur circuit colleagues addressing this issue have all held that the standards governing guideline sentences should apply to the statutory minimums in drug conspiracy cases"). The interpretation of the Sentencing Guidelines themselves, however, has not been consistent over time.

Before the 1989 amendments to the Sentencing Guidelines, sentencing determinations in a conspiracy included "conduct in furtherance of the conspiracy that was known to or was reasonably foreseeable by the defendant." USSG § 1B1.3 cmt. (n.1) (Nov. 1988). The 1989 amendments replaced this language with a negative construction, stating that sentencing determinations did not involve "conduct [that] was neither within the scope of the defendant's agreement, nor was reasonably

foreseeable." USSG § 1B1.3 cmt. (n.1) (Nov. 1989). The 1992 amendments made a number of changes focusing on the reasonable-foreseeability basis for sentencing, to the exclusion of the alternative knowledge-based language. The amendments included additional language indicating that a defendant should not be accountable for drug quantities distributed prior to his joining the conspiracy. See United States v. O'Campo, 973 F.2d 1015, 1025 n.10 (1st Cir. 1992). Relying at least in part on these changes, circuits that addressed this issue for the first time after the 1992 Sentencing Guidelines amendments generally have come to a different conclusion than that of Jones and other decisions rendered before the 1992 Sentencing Guidelines came into effect. See O'Campo, 973 F.2d 1015; Madkins, 14 F.3d 277; United States v. Irvin, 2 F.3d 72 (4th Cir. 1993); United States v. Carreon, 11 F.3d 1225 (5th Cir. 1994). The 1994 amendments then explicitly adopted the current counter, prospective-only, view of reasonable foreseeability. USSG § 1B1.3 commt. (n.2).

Notwithstanding that the analysis under § 841(b) remains "essentially the same" as under the Sentencing Guidelines, United States v. Smith, 240 F.3d 732, 736 (8th Cir. 2001), this court has not altered the application of § 841(b) by importing these particular Sentencing Guidelines amendments. We have continued to hold that the defendant is "'accountable for all reasonably foreseeable acts and omissions of any co-conspirator taken in furtherance of the conspiracy'" provided that such conduct must be "'in furtherance of the conspiracy and *either known to [the defendant]* or reasonably foreseeable to him.'" Smith, 240 F.3d at 737, 738 (emphasis added) (quotation and alteration omitted); see also O'Campo, 973 F.2d at 1024–25 (discussing the relevant changes made to the application notes of the Sentencing Guidelines, including the significance of the removal of "either known to or" language). In determining a mandatory minimum sentence pursuant to § 841(b), drug quantities distributed by a conspiracy can be "reasonably foreseeable" for *Pinkerton* liability purposes, even if those quantities were distributed before the defendant joined the conspiracy.

III.    Conclusion

We affirm the convictions and sentences of the three appellants.

ARNOLD, Circuit Judge, concurring and dissenting.

I concur in the court's opinion except for the part of it that affirms Mr. Osborne's sentence, and from that I respectfully dissent.  The government admits that Mr. Osborne did not join the conspiracy for which he was convicted until very late in its existence, yet the court approves sentencing Mr. Osborne based on acts that the conspiracy committed before he joined it.  This is contrary to both reason and authority.  Of course, the scope and object of the charged conspiracy can be proved by acts that it committed before Mr. Osborne joined it, *see*, *e.g.*, *United States v. Carrascal-Olivera*, 755 F.2d 1446, 1452 n.8 (11th Cir. 1985); and there were cases under a previous guideline regime holding that such acts could be charged against a defendant as relevant conduct in determining a sentence, if the defendant knew of them or if constructive knowledge of them could reasonably be imputed to him.  But, as the court notes, the guidelines now specifically repudiate this approach to sentencing.

There is no principled reason to ignore the command of the guidelines and apply sentencing rules to conspiracies to violate 21 U.S.C. § 841 that are different from the rules that apply to other conspiracies.  The guidelines apply to all conspiracies uniformly and there is nothing in the case law in the other circuits that indicates that drug conspiracies are entitled to some kind of carve-out from the generally applicable rules.  *See*, *e.g.*, *United States v. Irvin*, 2 F.3d  72 (4th Cir. 1993) *cert. denied*, 510 U.S. 1125 (1994); *United States v. Becerra*, 992 F.2d 960 (9th Cir. 1993); *United States v. Madkins*, 14 F.3d 277 (5th Cir. 1994).  Nor does *United States v. Smith*, 240 F.3d 732 (8th Cir. 2001), stand in the way of my conclusion.  The issue that the present case raises was not involved in *Smith,* and the general language in the

case does not require us to ignore the guidelines provision directing us not to use criminal activity that a conspiracy engaged in before a defendant joined it in fixing a defendant's sentence. In fact, *Smith* specifically says that the guideline rules apply to drug conspiracies: It could hardly have said otherwise, since the guidelines create no substantive crimes and apply to all crimes, absent, of course, some specific statutory direction, which is missing here.

I would therefore remand Mr. Osborne's case to the district court for resentencing under the correct legal principles.

_____