# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-3953

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Kevin Joseph Fenner, | * |
| | * |
| | * |
| Appellant. | * |

Appeals from the United States
District Court for the
District of Minnesota.

_____

No. 08-3955

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| v. | * |
| | * |
| Eric Dion Davis, | * |
| | * |
| Appellant. | * |

_____

Submitted: October 21, 2009
Filed: March 30, 2010

_____

Before MELLOY, SMITH, and SHEPHERD, Circuit Judges.

_____

MELLOY, Circuit Judge.

A jury convicted Kevin Fenner and Eric Davis of conspiring to distribute fentanyl and more than fifty grams of cocaine base in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). The jury also convicted them of various distribution and possession-with-intent-to-distribute charges stemming from the conspiracy. Fenner and Davis assert that prosecutorial misconduct occurred before the grand jury. Fenner also argues that cumulative prosecutorial misconduct before the petit jury deprived him of a fair trial and that, absent prejudice stemming from this misconduct, insufficient evidence existed to convict him of the crack cocaine-related charges. Additionally, Fenner and Davis present constitutional challenges to the mandatory minimum sentences in § 841(b)(1)(A). Finally, Davis, a convicted sex offender, maintains that the district court[1] erred in imposing sex-offender and/or mental-health treatment as a special condition of supervised release. For the following reasons, we affirm.

## I. Background

"We present the facts in the light most favorable to the jury's verdict." United States v. Foxx, 544 F.3d 943, 946 (8th Cir. 2008). In 2006, Fenner and Davis, along with Eric Hargrove, were involved in a drug trafficking operation in the Twin Cities. Hargrove is Fenner's cousin and pleaded guilty to charges related to his involvement in the events described below.

_____

[1]The Honorable Michael J. Davis, Chief Judge, United States District Court for the District of Minnesota.

A.     The investigation

Hargrove, Fenner, and Davis were arrested following an investigation that included four controlled buys involving two confidential informants. Prior to the first controlled buy, one of the informants discussed buying crack cocaine with Davis, whom he knew as "Smurf." Davis confirmed he would be able to sell the informant the drug. The informant provided this information to the police, who asked the informant to make a controlled purchase. The informant later met Fenner, whom he knew as "Nitty," and Fenner supplied the telephone number the informant used to set up the deal.

The first buy, for crack cocaine, occurred on May 11, 2006. The informant attempted to set up the purchase over the phone beginning the previous day, but it was delayed due to difficulties Fenner and Davis had cooking the powder cocaine into crack cocaine. Fenner and Davis both spoke with the informant at different times leading up to the buy. Their conversations were recorded. In the first conversation between Fenner and the informant, Fenner explained he could not cook the powder cocaine into crack cocaine himself because he was subject to random urinalysis. Davis answered the phone on other calls. On one, in which the informant testified he ordered crack cocaine, Davis confirmed he was with Fenner. Later, Davis said they were almost ready and would call the informant as soon as he finished and weighed the drug. In a subsequent call, Fenner said that he planned to cook the crack cocaine himself. Fenner eventually set up a meeting spot and the appellants arrived together in Fenner's car. Davis entered the informant's car while Fenner waited on the street, talking with an individual in a third vehicle while Davis completed the deal. The informant wore a wire to the meeting, and the wire picked up Davis describing problems in cooking powder cocaine into crack cocaine. The informant received more than sixty grams of crack cocaine from Davis.

The second buy, for fentanyl,[2] occurred on June 21, 2006.  The same confidential informant testified that he originally tried to buy both crack and heroin, but Fenner only had heroin (actually fentanyl) available   After a series of recorded calls between Fenner and the informant, they negotiated in person and eventually closed a deal for approximately eight grams of heroin (fentanyl).[3]

The third buy, also for fentanyl, occurred the next day, June 22, 2006.   A second confidential informant[4] and Davis set up the deal in recorded phone calls. Davis sent Hargrove to complete the transaction.  Hargrove met with the informant to sell nearly six grams of fentanyl.

The fourth buy was scheduled to occur on June 23, 2006.  In recorded phone calls, Davis and the second informant set up a deal for crack cocaine and heroin (fentanyl). Davis and Hargrove arrived at the informant's residence, and the informant met with them in their car.  The informant signaled to officers, who moved in to arrest Davis and Hargrove.  The officers recovered nearly six grams of fentanyl and approximately 120 grams of crack cocaine from Hargrove.

Officers arrested Fenner shortly after the arrests of Hargrove and Davis.  Fenner told officers that he had cocaine in his underwear, and police recovered a hard, rocky substance physically resembling crack cocaine.  The substance field tested positive for

_____

[2] Fentanyl is a synthetic form of heroin, which according to trial testimony, can be twenty to fifty times more potent than the natural form of the drug.  It is uncontested that the conspirators thought they were selling heroin rather than fentanyl.

[3] Hargrove was also present during the negotiations for the second buy, but did did not participate heavily in them.

[4] According to the second informant, prior to the controlled buys, Davis told him he could get either crack or powder cocaine. The informant testified Fenner was present during this discussion.

cocaine.[5]   Subsequent testing later revealed the substance was powder cocaine, notwithstanding its rock-like appearance.

After the arrests, officers executed a search warrant for Fenner's residence, which he shared with his father and Hargrove.  In Fenner's bedroom, officers recovered a loaded gun hidden under a mattress and $7,000 in cash from a safe, which included $900 from the second controlled buy of fentanyl.  Officers also discovered a digital gram scale in the kitchen.  In Hargrove's bedroom, officers found approximately 28.5 grams of crack cocaine, approximately thirty-three grams of fentanyl, and approximately $3,500.

B.    Grand jury indictment, trial, and sentencing

On July 13, 2006, a grand jury returned a multi-count indictment against Fenner, Davis, and Hargrove.  Count 1 charged all three defendants with conspiracy to distribute fentanyl and more than fifty grams of crack between May 11 and June 23, 2006, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). The other counts charged various distribution and possession-with-intent-to-distribute offenses based on the events described above.  Those involving crack cocaine are the most relevant to this appeal.  Count 2 charged Fenner and Davis with aiding and abetting each other in the distribution of crack during the first controlled buy on May 11, 2006.    Count 5 charged Davis (and Hargrove) with aiding and abetting each other in possession with the intent to distribute crack cocaine on June 23, 2006, the day of their arrest.  Count 7 originally charged Fenner with possession with intent to distribute crack cocaine on June 23.  As noted above, subsequent lab tests, reported August 9, 2006, revealed this to be powder cocaine and the indictment was amended to read as such.

_____

[5] The Government conceded to the district court that field testing can detect the presence of cocaine but cannot distinguish between the crack and powder forms.

For Fenner, the crack cocaine-related charges were the most serious. He had five prior felony drug convictions, triggering the statutory mandatory minimum of life imprisonment for an offense involving fifty or more grams of crack cocaine. 21 U.S.C. § 841(b)(1)(A)(iii). The Government filed a motion of sentencing enhancement under 21 U.S.C. § 851 based on the prior felony drug convictions. Fenner then participated in a proffer session with a written agreement that his statements could not be used against him at trial unless he took the stand and contradicted his proffer statements. Fenner eventually declined to cooperate and the plea deal fell through.

The case proceeded to a three-day jury trial in January 2007. During direct examinations of the informants, the jury heard the recorded phone calls arranging the controlled buys, as well audio picked up by the informants' wires during the buys themselves. The jury was permitted to follow along with transcripts while listening to these recordings and during the informants' testimony about the conversations. The informants also explained slang terms used by the participants as well as their understandings of the various conversations and transactions. The jury also saw separate law enforcement surveillance video for all but the last controlled buy, which resulted in the arrest of Davis and Hargrove.

The Government sought to establish the existence and nature of the overall conspiracy through, among other things, Hargrove's testimony. According to Hargrove, he and Fenner started selling crack cocaine, powder cocaine, and heroin after Hargrove moved to Minnesota in November 2005. They eventually began selling as partners, each taking orders and splitting up the proceeds. They kept the money in a safe in Fenner's room. Fenner had between ten to twenty customers all together, with approximately an equal number of crack and powder cocaine customers. Around January 2006, Davis joined their enterprise. After Davis joined the group, they continued to sell crack cocaine and heroin and share the profits.

Fenner would obtain the drugs, and they would store some of the drugs at Fenner's and Hargrove's residence prior to sale. Hargrove described his participation in the various controlled buys and confirmed that Davis set up the June 22 and June 23 deals. Hargrove also testified that Fenner provided the crack cocaine and heroin (fentanyl) found in Hargrove's bedroom during the June 23 search.

Both Fenner and Davis testified. Fenner's defense was designed to avoid a life sentence. He testified that he had pleaded guilty to prior drug offenses and admitted that he distributed fentanyl during the second controlled buy on June 21 and that he possessed powder cocaine with the intent to distribute on the day of his arrest. However, he testified that his involvement with cocaine was limited to powder, and he denied involvement with crack cocaine after his mother's death in 2004. The Government cross-examined Fenner using statements made during the proffer session. In light of these statements, Fenner eventually admitted that he obtained "cocaine" and heroin for the conspiracy and that he had cooked powder cocaine into crack cocaine in the past, but before the charged conspiracy began.

Davis also offered his own explanations for the recorded calls and taped meetings with the informants. He generally denied participating in the charged offenses, other than admitting that he and Hargrove met the second informant the day of their arrest to sell heroin (fentanyl). Much like Fenner, Davis disavowed involvement with crack.

Fenner moved for a mistrial following the Government's rebuttal summation, arguing that the Government misstated the law on co-conspirator liability. The district court denied the mistrial. The jury convicted Fenner and Davis on all counts and made a specific finding that the charged conspiracy (Count 1) involved fifty or more grams of crack cocaine. The district court also denied motions for a new trial. Sentencing was continued several times in light of, among other arguments, the Appellants' constitutional challenges to the mandatory minimums in 21 U.S.C. § 841(b)(1)(A)(iii).

In December 2008, the district court imposed a life sentence on Fenner. Davis received a sentence of 151 months' imprisonment and five years' supervised release. Davis had a prior state conviction for first-degree criminal sexual conduct, and the district court also imposed sex-offender and/or mental-health treatment as a condition of his supervised release. This appeal followed.

## II. Discussion

A. Prosecutorial misconduct in grand jury proceedings

Fenner and Davis assert that the Government made a deliberate misstatement of fact to the grand jury. At the end of the Government's presentation of evidence, a grand juror asked: "On all of these instances, were these substances tested and found to truly be fentanyl, heroin or crack cocaine?" The case agent who was testifying then discussed field tests of the substance obtained during the second controlled buy and efforts to identify it as fentanyl. The prosecutor followed up by asking: "But to answer your question, these things have all been tested now and it is what we say it is?" The case agent responded: "Yes, everything's been tested." The exchange concluded with the grand juror asking additional questions concerning the potency of fentanyl.

The Government has acknowledged that only field testing had been conducted on the drugs at the time of the grand jury proceedings on July 13, 2006. It is undisputed that the cocaine seized throughout the investigation field-tested positive for cocaine and resembled crack, including the hard, rocky substance seized from Fenner upon his June 23 arrest. However, lab results, reported in August after the grand jury proceeding, proved that substance seized from Fenner at the time of his arrest was powder and not crack cocaine. It is also undisputed that lab results confirmed the remaining cocaine seized was crack cocaine, which would include the more than sixty grams seized during the first controlled buy on May 11, as well as the 120 grams seized

from Hargrove following the aborted fourth controlled buy on June 23, and the 28.5 grams from Hargrove's bedroom.

Defense counsel received notice of the lab results and later obtained transcripts of the grand jury proceedings. On the day of trial, Fenner and Davis moved to dismiss the indictments as to the crack-related charges (Counts 1, 2, 5, and 7 of the original indictment), asserting the Government deceived the grand jury into thinking all the substances had been "truly tested" when they had not been. The Government countered, and maintains on appeal, that the case agent made an innocent misidentification of the single drug exhibit and that, because the defendants were in custody on a complaint, the Government had only thirty days to indict and could not wait on the lab results. The district court denied the motions to dismiss, and it granted a Government motion to amend Count 7 of Fenner's indictment to read possession with intent to distribute powder cocaine on June 23, 2006, instead of crack cocaine. At trial, a DEA agent explained to the petit jury that officers initially thought the substance seized from Fenner at his arrest was crack cocaine, based on its appearance, but that the results later showed it to be powder. Following conviction on all charges, the defendants renewed their objections in motions for a new trial, which the district court denied.

"[G]rand jury proceedings are afforded a strong presumption of regularity, and a defendant seeking to overcome that presumption faces a heavy burden." United States v. Hintzman, 806 F.2d 840, 843 (8th Cir. 1986). Dismissal is an "extreme remedy," United States v. Two Eagle, 318 F.3d 785, 793 (8th Cir. 2003), and is inappropriate absent a showing of actual prejudice. United States v. Wilson, 565 F.3d 1059, 1070 (8th Cir. 2009). We hesitate here to label the well-explained and potentially innocent misstatement as misconduct. However, even if we were to assume prosecutorial misconduct occurred, it is well-established that a petit jury's guilty verdict normally renders errors in the grand jury proceedings harmless. See, e.g., Wilson, 565 F.3d at 1064, 1069–70; United States v. Pumpkin Seed, 572 F.3d 552, 556–57 (8th Cir. 2009)

(in sex abuse prosecution, error was harmless even if special agent's testimony deceived grand jury into believing that defendant was source of semen and pubic hair found on victim's rape kit, when lab results, only available after the indictment, later proved him not to be); United States v. Sanders, 341 F.3d 809, 818–19 (8th Cir. 2003) ( absent race discrimination in choosing grand jury, guilty verdict meant defendant was guilty as charged beyond a reasonable doubt). As discussed below, the subsequent trial was not so infected by prejudicial error to persuade us to depart from this general rule.

B.     Prosecutorial misconduct at trial

Fenner also argues that, along with the alleged misconduct in front of the grand jury, prosecutorial misconduct at trial cumulatively deprived him of due process and rendered the evidence insufficient to convict him as to Counts 1 and 2.

> To obtain a reversal based on prosecutorial misconduct to which there was proper objection, a defendant must show that (1) the prosecutor's remarks or conduct were improper, and (2) the remarks or conduct affected the defendant's substantial rights so as to deprive him of a fair trial. If the remarks were improper, we determine whether they deprived the defendant of a fair trial by examining the cumulative effect of the misconduct, the strength of the properly admitted evidence of the defendant's guilt, and any curative actions taken by the trial judge.

United States v. New, 491 F.3d 369, 377 (8th Cir. 2007) (internal citations omitted).

Fenner makes several intertwined arguments concerning misconduct during the Government's direct examinations. We find them to be without merit. First, Fenner makes several broad accusations that the Government used leading questions on direct examination of its key witnesses. We observe that although Federal Rule of Evidence 611(c) generally discourages the use of leading questions on direct, it is not automatically improper for the prosecutor to ask such questions or for the district court

to permit their use.  See Fed. R. Evid. 611(c).  The plain language of the rule allows leading questions, for example, as necessary as to develop a witness's testimony.  Id.; see also United States v. Reddix, 106 F.3d 236, 238 (8th Cir. 1997).  Simply put, the trial judge has wide latitude in permitting leading questions because he or she is in the best position to determine the need for them.  See, e.g., United States v. Schepp, 746 F.2d 406, 410 (8th Cir. 1984).

Even assuming impropriety in the phrasing of some of the Government's questions,  upon review the transcripts, we cannot agree with Fenner that "eventually all . . . objections were overruled" or that the Government "was allowed to lead crucial witnesses insistently."  By our count, Fenner's attorney objected eight times during the Government's case in chief as to the form of specific questions as leading:  three times during the first informant's testimony and five times during Hargrove's.  In all but two instances, the district court sustained the objections and the government rephrased. On these facts, we cannot say Fenner was prejudiced by the use of leading questions.  See Schepp, 746 F.3d at 410 (holding court did not abuse its discretion in permitting use of leading question where defendant's counsel objected three times during the government's examination of its key witness); Reddix, 106 F.3d at 238 (same).

Fenner also claims the Government misused transcripts of the recorded conversations during its direct examinations of the confidential informants.  The transcripts themselves were not admitted into evidence and they were appropriately used before the jury at trial.[6]  His argument on this point comes down to additional

---

[6] Fenner objected to the use of the transcripts in a motion in limine and at trial.  Over these objections,  the jury followed along with transcripts as they listened to the numerous taped conversations related to the controlled buys.   The  Government referred back to the transcripts at points to guide the informants' testimony concerning what was heard on tape.  The transcripts were collected at the end of testimony.  The district court also repeatedly instructed the jury that the tape recordings were the evidence and that any discrepancy between the tapes and the transcripts should be

assertions, made without citation to the record, that the Government posed leading questions and that the Government "convert[ed] the witnesses into experts on what Mr. Fenner was doing or intending" by asking them to explain slang terms and give their interpretations of what Fenner and other co-conspirators said on the tape recordings. This line of questioning was not improper. The informants had participated in the conversations and their explanations at trial were based on their perceptions. See United States v. Scott, 243 F.3d 1103, 1107 (8th Cir. 2001) (stating that in a case where the jury heard audio tapes of intercepted calls, "[a] district court does not abuse its discretion in admitting testimony by a [co-conspirator] witness with firsthand knowledge as to his understanding of words used by the defendant or other conspirators.").

Fenner next alleges impropriety in the way the Government handled the difference between powder and crack cocaine. He argues that the Government generally tried to manipulate the jury into thinking that no difference existed between crack and powder cocaine and capitalized on their unawareness of the disparity in sentencing between the two forms of the drug.[7] More specifically, he cites several exchanges that allegedly show the Government prompted the first informant and Hargrove to answer "crack cocaine" when it needed that answer to support its case as to the crack cocaine conspiracy and distribution charges. Upon review of the transcripts, we disagree with this characterization.

_____

resolved in favor of what the jurors heard. We have found similar procedures permissible. Scott, 243 F.3d at 1107; see also United States v. Delpit, 94 F.3d 1134, 1147–48 (8th Cir. 1996).

[7]The district court gave the typical instruction that penalties are not for the jury's consideration. See, e.g., Manual of Model Criminal Jury Instructions for the District Courts of the Eighth Circuit, § 3.12 (2009). We agree with the Government that any reference to sentencing would have been improper. See United States v. Delgado, 914 F.2d 1062, 1067 (8th Cir. 1990) ("Punishment is within the province of the court.").

-12-

Typically, if a witness responded in a non-specific manner as to the type of drug being discussed, the Government posed follow-up questions to specify the type of cocaine. It was not improper to ask for clarification on these facts. Fenner was charged with offenses related to both forms of cocaine. The jury also had to determine whether the conspiracy involved fifty or more grams of crack cocaine. Additionally, as Fenner observes, his defense both to the crack cocaine conspiracy and May 11 distribution charges was that he was only involved with fentanyl and powder cocaine, but not crack. Therefore, the jury had to keep track of the type of cocaine discussed at any given time in order to competently assess these issues. To the extent that the Government failed on occasion to clarify a non-specific response, we cannot detect from the record an attempt to confuse the jury or a corresponding need to supply answers to faltering witnesses. Finally, we observe that in at least one exchange Fenner cites, the clarified answer indicated Fenner's involvement with powder instead of crack cocaine, which tended to support his theory of the case.

Fenner also alleges the Government inaccurately cross-examined him with statements he made during the proffer session and misstated the law during its rebuttal closing argument by allegedly "advanc[ing] a substitute theory of conviction that Mr. Fenner was guilty of crack because powder can turn into crack." Even if we viewed this conduct as improper, we do not believe Fenner was deprived of a fair trial given the strength of the evidence against him. See United States v. Eagle, 515 F.3d 794, 806 (8th Cir. 2008).

As laid out above, there was ample evidence to establish that Fenner conspired to distribute fifty or more grams of crack cocaine. We note that although Fenner was never caught with any crack cocaine on him, "jury verdicts may be based solely on the testimony of conspirators and cooperating witnesses." United States v. Jones, 559 F.3d 831, 835 (8th Cir. 2009). Hargrove's testimony established that he and Fenner

distributed crack cocaine together from the time Hargrove moved to Minnesota in November 2005, continuing after Davis joined them in January 2006 until their respective arrests. The second informant confirmed that prior to the controlled buys marking the beginning of the charged conspiracy, he discussed buying crack cocaine with Davis while Fenner was present. Two of the controlled buys themselves involved crack cocaine, totalling well beyond the required fifty grams. Fenner participated directly in one of these controlled buys–the first one on May 11, 2006–with Davis. Some twenty-eight grams were found in Fenner's home, and even though it was found in Hargrove's bedroom, Hargrove testified that it came from Fenner.

There is similarly strong evidence against Fenner as to the May 11 controlled buy. The informant testified Fenner gave him the phone number to set up the buy. Fenner is heard on several recorded phone calls prior to the deal. Fenner discussed cooking powder cocaine into crack cocaine with the informant, and on one call, Fenner said he would cook the crack himself. In another call between the informant and Davis—in which the informant testified he ordered crack—Davis confirmed that he was with Fenner. Fenner was the one who eventually told the informant where to meet. Surveillance video showed Fenner and Davis arriving together in Fenner's vehicle. Fenner waited for Davis while Davis met with the informant to conclude the deal. While in the car with the informant, Davis also discussed problems cooking crack. In light of this evidence, we have little trouble concluding that Fenner was not prejudiced by any alleged incidents of prosecutorial misconduct.

C.  Constitutional challenges to the mandatory minimum sentences in 21 U.S.C. §841(b)(1)(A)

Fenner and Davis moved the district court to declare the mandatory minimums in 21 U.S.C. § 841(b)(1)(A)(iii) on Fifth Amendment grounds. Fenner also challenged

-14-

his sentence on Eighth Amendment grounds. The district court, after continuing sentencing several times, ultimately rejected these arguments, and we affirm.

Fenner and Davis, who are both African American, renew their arguments that the 100:1 crack-to-powder cocaine ratio used to calculate the statutory mandatory minimums disproportionately impacts African-Americans, violating equal protection.[8] They assert that the assumptions underlying the minimums have been discredited and that a consensus exists that these mandatory minimums can no longer pass constitutional muster, as evidenced by the amendment of the Sentencing Guidelines to reduce the disparity, the introduction of Congressional bills to do the same, and the Supreme Court's decisions in United States v. Kimbrough, 128 S. Ct. 558 (2007) and subsequent cases. We review *de novo* constitutional challenges to a statute. United States v. Watts, 553 F.3d 603, 604 (8th Cir.) (per curiam), cert. denied, 130 S. Ct. 141 (2009). We have recently rejected similar arguments regarding the five-year mandatory minimum in 21 U.S.C. § 841(b)(1)(B). Watts, 553 F.3d at 604–05; United States v. McClellon, 578 F.3d 846, 861–62 (8th Cir.), cert. denied, 130 S. Ct. 1106 (2009). The mandatory minimums in § 841(b)(1)(A) do not violate equal protection. See id. (discussing circuit case law); United States v. Alexander, 301 F. App'x 580, 580 (8th Cir. 2008) (unpublished per curiam) (holding the ten-year mandatory minimum in 21 U.S.C. §841(b)(1)(A) constitutional).

Fenner also renews his Eighth Amendment challenge, arguing that imposing a life sentence would amount to cruel and unusual punishment. He again asserts that a

---

[8]To the extent Fenner continues to challenge the mandatory minimums on Fifth Amendment due process grounds, we reject this argument as well. United States v. Prior, 107 F.3d 654, 658-59 (8th Cir. 1997).

growing consensus exists that disparity in sentencing between crack and powder cocaine disproportionately punishes African Americans. The district court, citing our decision in United States v. Whiting, 528 F.3d 595 (8th Cir.) (per curiam), cert. denied, 128 S. Ct. 443 (2008), determined that the mandatory life sentence was not grossly disproportionate. Whiting, 528 F.3d at 597. We agree. In light of the quantity of drugs involved and Fenner's five felony drug convictions, we reject his Eighth Amendment challenge. Id. at 528 F.3d at 597; United States v. Williams, 534 F.3d 980, 986 (8th Cir. 2008) ("Our circuit precedent upholding the constitutionality of life sentences imposed under § 841(b)(1)(A) mandates affirmance" where defendant convicted of conspiring to and possessing with intent to distribute more than fifty grams of crack cocaine and had two prior felony drug convictions); see also United States v. Whitehead, 487 F.3d 1068, 1070–71 (8th Cir. 2007).

D.      Special condition of supervised release

Finally, Davis argues that the district court erred by ordering, as a condition of supervised release, that he participate in and pay for "sex offender and/or mental health treatment." His pre-sentence report indicates that in 1995, Davis was found guilty of first degree criminal sexual conduct in a Minnesota court for raping a woman he met at bar. According to the pre-sentence report, Davis ordered her to perform oral sex at gun point, and then he and another individual raped her. Previously, he had pled guilty to misdemeanor domestic assault and violated his probation by failing to complete a domestic abuse program.

According to the pre-sentence report, Davis was imprisoned approximately eight years for the criminal sexual conduct conviction. The record does not clearly state whether the state court ordered him to enroll in a sex-offender treatment program as part of his sentence, but his pre-sentence report does state that he refused to undergo "treatment" while in prison. Davis was released in 2003, but supervision had not

terminated at the time of the instant drug offenses. Davis is required to register as a sex offender under state and federal law for the sex offense. Records show that he was in compliance with the Minnesota registry. Finally, the pre-sentence report recites that Davis reported no history of mental health issues or prior mental health treatment.

Davis acknowledged at oral argument that he did not object to the condition at the district court, and we review for plain error. United States v. Kreitinger, 576 F.3d 500, 505 (8th Cir. 2009). "Plain error occurs if the district court errs, the error is clear under current law, and the error affects the defendant's substantial rights." United States v. Conelly, 451 F.3d 942, 944–45 (8th Cir. 2006). If a defendant shows prejudicial error in sentencing, we exercise discretion to correct it "only if it seriously affects the fairness, integrity, or public reputation of judicial proceedings." United States v. Starfield, 563 F.3d 673, 674–75 (8th Cir. 2009) (internal quotations and citation omitted). Applying this standard of review, we affirm.

A condition of supervised release must (1) be reasonably related to the statutory sentencing factors set forth in 18 U.S.C. 3553(a); (2) involve no greater deprivation of liberty than is reasonably necessary for the purposes set forth in 3553(a); and (3) be consistent with any pertinent policy statements issued by the Sentencing Commission. United States v. Bender, 566 F.3d 748, 751 (8th Cir. 2009). "A condition is reasonably related to the statutory factors if tailored to the 'nature and circumstances of the offense, the defendant's history and characteristics, the deterrence of criminal conduct, the protection of the public from further crimes of the defendant, and the defendant's educational, vocational, medicinal, or other correctional needs.'" Id. (quoting United States v. Crume, 422 F.3d 728, 733 (8th Cir. 2005)). However, we note at the outset that "it is not necessary for a special condition to be related to all the statutory factors, but rather they are to be weighed independently." United States v. Camp, 410 F.3d 1042, 1046 (8th Cir. 2006). We have held that, in regard to mental health treatment specifically, the district court must have reason to believe the defendant is in need of

it. Conelly, 451 F.3d at 945. Davis argues that the condition did not bear a reasonable relationship to the instant drug offenses and that there is no other evidence to suggest he was in of need the "sex-offender and/or mental health treatment."

We have previously addressed the imposition of sex-offender conditions for non-sexually related offenses. Davis urges us to rely on United States v. Scott, 270 F.3d 632 (8th Cir. 2001), where we held that a district court abused its discretion in imposing special conditions of sex-offenders on a defendant who pleaded guilty for armed bank robbery. Id. at 636. The defendant had been convicted of forcibly raping and sodomizing his nine-year-old stepdaughter some fifteen years earlier, but no sex-offender-related conditions were imposed then or at his sentencing on the armed robbery charges. Id. at 633–34. It was not until the second time the defendant violated his supervised release on the armed robbery sentence that the district court considered the old sexual-offense conviction and imposed the sex-offender conditions. Id. The conditions were restrictive, preventing him, among other things, from possessing stimulating or sexually oriented material and from maintaining a post office box other private mail box. Id. at 634–35. We held that the conditions were not "reasonably related to the current offense" and that the conditions seemed unlikely to serve the goals of deterrence or public safety, since the behavior on which the special conditions were based had ceased. Id. at 636.

The Government maintains that Davis's case is closer to our decision in United States v. Smart, 472 F.3d 556 (8th Cir. 2006), where, also under an abuse-of-discretion standard of review, we affirmed the imposition of sex offender-related conditions on a defendant who had pleaded guilty of being a felon in possession of a firearm. Id. at 558–59. We distinguished the case from Scott, noting that the conditions were less restrictive and the sexual offenses were temporally closer to the imposition of sex-offender conditions of supervised release. Id. at 559. We also emphasized that Smart's "criminal history include[d] two sexual abuse offenses, that he was still on

probation for the latest sexual abuse offense at the time that he committed the present [felon-in-possession] offense, and that he still has an outstanding warrant for a probation violation on the latest sexual abuse offense." Id. On these facts, we reiterated that the conditions need not directly relate to the instant offense and held they were "reasonably related to [the appellant's] history and characteristics and the need to protect the public from further crimes." Id.

In the present case, we decline to engage in precise line-drawing based on Scott and Smart. Although the sex-offender treatment does not relate to the drug offenses, it does relate to "another offense that the defendant previously committed." Smart, 472 F.3d at 55. We also observe the violence exhibited in the sexual offense itself and elsewhere in Davis's criminal history, Davis's history of refusing to participate in treatment, and the fact that supervised release had not terminated at the time of the instant drug offense. On these facts, we cannot say the district court imposed this conditions "on the basis of pure speculation or assumptions" unrelated to Davis's history and characteristics or his rehabilitative needs. See Kreitinger, 576 F.3d at 506 (internal quotation omitted). Finally, we note that this condition is not unduly restrictive of Davis's liberty. See Conelly, 451 F.3d at 944 (affirming imposition of special condition that required the defendant "attend, successfully complete, and pay for any mental health diagnostic evaluations and treatment or counseling programs"); United States v. Ross, 315 F.3d 206, 217 (3d Cir. 2003) (requiring defendant who pleaded guilty to, inter alia, child pornography offenses to submit to random polygraph testing was not unduly restrictive of defendant's liberty).

In sum, under plain error review, we cannot discern any error as to the sex-offender treatment so obvious as to warrant correction, given that the facts here fall somewhat in between prior cases and the different standard of review utilized in them. Similarly, even assuming the district court obviously erred by imposing the possibility

of mental health treatment without more in the record, the facts of this case do not suggest that failing to correct it would impugn the integrity of the judicial process.

Davis also contends that the special conditions were an improper delegation of authority to the probation officer, citing our decision in United States v. Kent, 209 F.3d 1073 (8th Cir. 2000). We disagree. We have repeatedly held since Kent that there is no improper delegation where the district court does not disclaim ultimate authority for deciding the appropriateness of treatment. United States v. Wynn, 553 F.3d 1114, 1120 (8th Cir. 2009) (collecting cases). Here, the phrase "as approved by the probation officer" does not indicate an abdication of responsibility, and nothing in the record suggests otherwise.

III. Conclusion

For the foregoing reasons, we affirm.

_____